Steere and others *against* Steere and others.(*a*)

Though a trust need not be created by writing, yet, to take the case out of the statute of frauds, its terms and conditions must be clearly manifested and proved in writing, under the hand of the party to be charged, before the Court will carry it into execution.

Loose and general declarations of intention, by one member of a family, of holding property in trust for the other members, are not sufficient for the deduction of a *trust* which equity will recognise and enforce. Letters and accounts addressed by *S.*, to his brothers, under the circumstances, were held insufficient to raise a trust, by implication, to the father.

Parol evidence to contradict the inference as to a trust, deduced from written documents, is inadmissible; but, it seems, that where written documents are loose and ambiguous, parol evidence is admissible, to explain the obscurity of the case, and to show what was the understanding of all the parties concerned.

To raise a trust by implication, or operation of law, an actual payment, or actual loan of the money by the *cestui que trust*, at the time of the purchase, must be shown.

THE original bill, filed *February* 21st, 1818, stated, among other things, that *Stephen Steere*, father of the plain-

1820.

STEERE
v.
STEERE.

*Sept.* 1*st*, and *Oct.* 2*d.*

(*a*) This and the three following cases were omitted in their order in the *fourth* volume.

tiffs, *Timothy*, *Smith*, and *T. Steere*, was seised in fee, prior to the 18th of *October*, 1802, of various parcels of land in the county of *Chenango*, and which were particularly described, amounting in the whole to 739 acres, and all of which, except 47 acres, was situate in the town of *Norwich*.

That on the 18th of *October*, 1802, S. *Phettiplace* obtained a judgment against *Stephen Steere*, for 1,258 dollars, on which a *fi. fa.* was issued in 1805, and all the lands of *Stephen Steere*, in the county of *Chenango*, advertised for sale. That *Richard Steere* and *Mark Steere*, defendants, sons of *Stephen Steere*, in *August*, 1806, bid off all the real estate of *Stephen Steere*, at the sheriff's sale, for 1,600 dollars, and paid 1,400 dollars, the amount of the judgment, interest, and costs, and took a deed from the sheriff for " the whole of the real estate of *Stephen Steere*, in the county of *Chenango*, and his right and title thereto:" and the levy and advertisement of the lands, by the sheriff, were in the same general terms of description. The bill alleged that the deed was taken in trust, pursuant to a previous agreement with *Stephen Steere*, to loan him the amount of the judgment, and to hold the land as security, to be reconveyed, on repayment of the loan, with interest and expenses, and of such other sums as might thereafter be loaned to *Stephen Steere*, by *Richard* and *Mark Steere*. That the *Cole Lot*, containing 120 acres, belonging to *Stephen Steere*, was sold by the sheriff, under a judgment and execution in favour of *James Glover*, in *December*, 1799, to *James Glover*, for 140 dollars, being much less than its value; and that *James Glover* agreed to reconvey the land to *Stephen Steere*, on the payment of the 140 dollars, and interest. That in *August*, 1809, *Mark Steere* released to *Richard Steere*, all his interest in the lands under the sheriff's deed of *August*, 1805, and became insolvent: That on the 30th of *April*, 1808, *James Glover* conveyed to *Asel Steere*, defendant, another son of *Stephen Steere*, the *Cole and Glover Farms*; that *Asel Steere* conveyed the same farms to *Rich-*

*ard* and *Mark Steere*. That the purchase was made pursuant to an agreement with *Stephen Steere*, and that *Asel Steere* acted merely as the agent of *Richard* and *Mark Steere*, and the land was to be held in trust for *Stephen Steere*. That on the 14th of *August*, 1809, *Asel Steere* made a new conveyance to *Richard Steere*, of the *Cole* and *Glover Farms*. The bill then proceeded to state sales and conveyances of various parcels of the lands by *Richard Steere*, to different persons, and of the sums of money received by him on such sales, and for rents; all of which sales and conveyances were alleged to be made by *Richard Steere*, as trustee, &c.

The bill alleged, that the deed of *August*, 1805, from the sheriff to *Richard* and *Mark Steere*, was void at law, as the description of the lands sold was too general and undefined. That in 1808, *Stephen Steere* requested *Richard* and *Mark Steere* to reconvey to him all the property, except the *Unadilla Farm*, being 325 acres, which he agreed that they might retain in satisfaction for their advances, &c.; and which far exceeded the value of all their advances, which they neglected to do. That *Stephen Steere* requested *Richard* and *Mark Steere* to account to him for all the moneys received by them, as trustees, from the sales, rents, and profits of the lands, after allowing the money advanced by them on the judgment of *Phettiplace*, and all their just expense and demands; but that *Richard* and *Mark Steere* presented unjust and false accounts of moneys, which they pretended to have advanced, the items of which were particularly set forth; and insisted on holding the property to cover the same. That on the 25th of *October*, 1815, *Stephen Steere* made his will, reciting the lands of which he was seised in *Norwich*, and particularly describing the same, and declaring, that " it was his intention to dispose of all his real and personal estate wheresoever, to his three sons, plaintiffs, viz: the one moiety thereof to *Timothy*, and the other moiety to *Smith* and *Thomas*. That he appointed

*James Birdsall* his executor. That the testator died *April* 22d, 1816, without being in debt, and the plaintiffs were thus devisees and legatees of all his real and personal estate. That *Richard* and *Mark Steere* refused to account and convey to them the property, so held in trust; that the trusts had been acknowleged by *Richard* and *Mark*, in letters and accounts. That the plaintiffs were willing to confirm all the sales made by *Richard* and *Mark*, not confirmed by *Stephen Steere*, in his life time, but that *Richard* and *Mark* ought to account for the moneys, and assign the securities received by them. That *Richard Steere* had brought a suit at law against the plaintiff *Timothy Steere*, on his bond for 540 dollars. given to *Richard Steere*, for a part of the trust property sold and conveyed by him to *Timothy Steere*, but that the plaintiff, *Timothy*, cannot plead at law, the various and complicated trusts above mentioned. The bill *prayed* that the defendants, *Richard* and *Mark Steere*, may be decreed to account to the plaintiffs for the rents and profits received by them on the lands so held in trust, and for the moneys and securities received on sales, &c., making to them all just allowances for loans, advances, and expenses; and to pay over the balance to the plaintiffs, and reconvey to them the lands so held in trust and undisposed of, and for general relief, and for an injunction against the suit at law. By an *amendment* to the original bill, the *accounts* and *letters*, said to contain an acknowlegment of the trust, were set forth at large and several special interrogations added.

The defendants, *Richard* and *Mark Steere*, in their *answers*, the whole of which it is unnecessary to state, denied the trusts alleged in the bill, or any agreement whatever, to advance money, and to purchase and hold the property in trust, or any conversation, before or after the sale, with *Stephen Steere*, relative to a purchase in trust. *Richard Steere* admitted, that *Asel Steere* informed him of the execution, and that it was the wish of all the brothers that he and *Mark Steere* should attend the sale and buy in the pro-

perty, so as to deprive *Stephen Steere* of all control over it, as he was then much embarrassed. They admitted that *Stephen Steere* acquiesced in the sale, under the idea that it would be better for the defendants, *Richard* and *Mark Steere*, to have the land than strangers; that it might have been the hope and expectation of *Stephen Steere*, and his children, that *Richard* and *Mark Steere*, would give a share of the property to them. That *Richard* and *Mark Steere* had often advanced large sums of money to *Stephen Steere*, to save his stock, &c., and permitted him to reside on part of the estate. That the defendant, *Richard Steere*, may have promised the plaintiffs to distribute part of the real estate among them, and may have said and written things for that purpose; and had made gifts of land and money with that view; but they denied that these acts of kindness amounted to a trust. That pursuant to an agreement between *Richard* and *Mark Steere*, *Timothy* and *Stephen Steere*, jun., of *January*, 1814, by which *Richard Steere* agreed to convey to *Mark Steere*, and *Timothy Steere*, each, land to the value of 1,000 dollars, he conveyed 43 acres to *Stephen Steere*, jun., 33 acres to *Mark Steere*, and 38 acres to *Timothy Steere*, and that he took the bond of *Timothy Steere*, for 540 dollars, being the excess in the value of the land conveyed to him, over and above the 1,000 dollars. That these deeds were gratuitous. That by that agreement he was to convey the residue of the land to *Timothy Steere* and *Mark Steere*, who were to sell the same, and pay the defendant his expenses and advances; but owing to the failure of *Mark Steere*, the agreement was only in part carried into effect. But he denied that any of these gifts and conveyances were made with the understanding or belief, that he was bound as trustee to *Stephen Steere*. The defendants, *Richard* and *Mark*, admitted the account of the 28th of *January*, 1809, but denied that it was made up and presented by them as trustees; that the account of the estate was on loose papers, prior to 1809, and the account

1820.

STEERE
v.
STEERE.

was made out from those papers, which are now mislaid, or in the possession of the plaintiffs. That the name of *Stephen Steere* was used in the account to distinguish the estate from the other estate of *Richard* and *Mark*, and that the name of *Stephen Steere* was used as a debtor, because the estate was looked upon as a family patrimony, in which, from the gratuities of *Richard Steere*, they expected to share. That *Mark Steere*, at that time, proposed to release his share, on being paid his advances, &c., and the account was made up to ascertain the consideration to be paid to *Mark Steere*, which was found to amount to 3,901 dollars and 80 cents, which *Richard Steere* paid to *Mark Steere*. That *Richard Steere* then made an estimate of what further advances he had made, and in the same form, using the name of *Stephen Steere* as a debtor, and *Richard Steere* as creditor, for the sake of convenience. That the account was made out for the satisfaction of the plaintiffs and the family, and to show that any further demands on him were unreasonable. That the account was retained by him as a private memorandum, until *February*, 1814, and to assist in the gratuitous disposition of the property among the family. That in *January*, 1814, an agreement by parol was entered into between *Richard Steere*, *Mark Steere*, and the plaintiffs, of which a memorandum was reduced to writing by *James Birdsall*, and which was acceded to by *Richard Steere*, on the ground that it would be satisfactory; and to facilitate it, and not as trustee, he wrote the letter mentioned in the amended bill, to *Mark Steere*, dated *February* 12th, 1814, containing the account, &c., of *January* 28th, 1809, but he denied that the letter was written at the request of *Stephen Steere*, or as trustee. That in 1815 *Stephen Steere* was nearly eighty years old, and was induced by the plaintiffs, his younger children, to make his will in their favour, to the exclusion of his eight other children then living.

One of the accounts of the 28th of *January*, 1809, referred

to in the bill, made *Stephen Steere* debtor to *Mark Steere*, for his bond dated *September* 3d, 1803, and the interest thereon at 8 per cent. and for various sums advanced, and for expenses of two journeys to *Chenango*, the whole amounting to 3,901 dollars and 80 cents. The other account was against *Stephen Steere*, as debtor to *Richard Steere*, containing different charges for sums advanced, among which were the expenses of several journeys to *Chenango*, and at the foot were added various charges for advances, under subsequent dates, among which was one of 1,000 dollars, towards a mortgage to *Glover*, the whole amount being 3,016 dollars and 26 cents. In a letter from *Richard* to *Mark Steere*, dated *Smithfield, February* 12th, 1814, the former writes, as follows: " I herewith present you with the amount of my account against the estate of *Stephen Steere*, as follows: *Richard* and *Mark Steere's* account against *Stephen Steere*, as appears by the original account, and your casting up to 28th of *May*, 1810, amounts to 7,840 dollars, and 46 cents, four years *interest*, 3,126 dollars 16 cents, the *Glover* debt when settled, in *March*, 1813, and costs, 2,600 dollars, and interest thereon, 286 dollars." Certain credits were also stated, among which was 500 dollars, on a sale of land to *Gunn*, and for the *Unadilla Farm*, 6,000 dollars, leaving a balance of 6,085 dollars and 62 cents due *Richard Steere*. A note of the sums due for lands sold was subjoined, amounting to 6,720 dollars. The letter continued as follows: " So that you will see by this statement, that you will pay me and retain 110 acres on the south side of the way, to pay you and *Stephen*, and the remainder divide. I think you may do as well, or nearly as well, as above stated. I send the original account, for the satisfaction of *Stephen* and *Timothy*, together with a paper, on which you have heretofore cast it, both of which papers I wish you to keep, as they may hereafter be wanted. The old account had been agreed to by father." In a letter, dated *Smithfield, October* 19th, 1806, *Richard Steere*

writes to *Asel Steere*, as follows : " I wish you to assist father in every possible way in acquiring a good title to his land from *Glover*, and likewise to get *White's* lease on the *Unadilla Farm* settled, as there is a prospect of selling that this fall."——" If in case we sell it, I don't know but it will be necessary for father to come down and take a quit claim from us, and give a warrantee deed, but if we trade, I will write you further on this subject ; at any rate, I wish to have it clear of *White's* lease, but, as it seems some fatality attends all father's business, I am not in much expectation of its being soon done."——" It is particularly necessary for father to attend to this business, as we are called upon for the money advanced, and shall be under the disagreeable necessity of selling other land, in order to reimburse ourselves, and which father and the family would choose to keep in preference to the *Unadilla Farm*. I am particularly unfortunate in all my dealings with father ; for at the time we were up last year, a little before which I understood by him, that his object in redeeming his land was on account of its going to the family, and not to strangers ; I inferred from that, if in case it came into our hands, he would certainly have no objections to our deeding a part to his children ; under those circumstances, I assisted in raising the money, with a promise to many of the family, that it should not go out of my hands without their having a part, which I believe you will very well recollect. Now, it seems, I must either break my promise with my brethren, or incur the heavy displeasure of my father. I must confess that the situation of the *Glover Lot,* lying so long, when the probability of its going to strangers was so great, with the averseness to deeding to his sons, does not, in my opinion, square with his conversation last year, above written."——" If there is any compromise that can take place between father and my brothers, whether in lands or any otherwise, so that I may escape the heavy sin of a breach of promise, I shall with all cheerfulness acquiese in it ; but,

by the way, *Jane* would expect to be included." In another letter, dated *Smithfield,* 9th of *July,* 1807, *Richard* writes to his brother *Asel,* as follows: " Father wishes very much for *Mark* and I to reconvey back all the land in your county, in our purchases, except the *Unadilla Farm,* which we cannot at this time comply with. As there seems to be a willingness on *Mark's* part to reconvey, whenever he is paid, it makes it hard, on my part, to perform my engagements with my brethren, and give father satisfaction. He appears to be willing to give *Stephen* and *Timothy* a 1,000 dollars each, *Jane* 500 dollars, and defray *Simon's* expenses at *Doctor Bellows.* *Timothy* is willing to take his, and I wish you to use your influence with *Stephen* to consent to take his, or agree with father some other way, for really, I wish the matter settled."

1820.

STEERE
v
STEERE.

In a letter, dated *Smithfield,* 8th of *August,* 1809, from *Richard Steere,* to *Stephen, Asel,* and *Timothy Steere,* after mentioning the loss of a vessel and cargo belonging to *Mark,* and that all his property was attached, and that he, *Richard,* was left bound with him for a large amount, without security, unless he could be secured in *Chenango* county, *Richard* adds : " I herewith send a deed from *Mark* to me, last winter, which I hope you will lose no time in having acknowleged and recorded. You will see the necessity of this ; for otherwise, *Mark* holds more than treble the land which is justly due to him, which is wholly lost to his family, if his creditors here should attach it, before my deed should be recorded. The deed or deeds made to *Mark* and I of the *Cole* and *Glover Lots* from *Asel,* now in the hands of *Stephen,* must be given up or destroyed, and a deed or deeds made to me, at the same prices, which last must be recorded."—" I wish his creditors to have all his property, but to have the other property, which he holds to a large amount for security, torn from the family, would be distressing indeed." Several witnesses

1820.

STEERE
v.
STEERE.

were examined on both sides, the material part of whose testimony is stated in the opinion of the Court.

The cause came on to be heard this day.

*Sept.* 1*st.*    *Henry*, for the plaintiffs, contended, 1. That the deed of the 10th of *August*, 1805, from the sheriff to *Richard* and *Mark Steere*, was not a valid conveyance; the description of the lands conveyed being too vague and uncertain. (1 *Johns. Cases*, 287. 2 *Caines' Rep.* 66. 11 *Johns. Rep.* 373. 13 *Johns. Rep.* 551. 16 *Johns. Rep.* 122.)

2. That if that deed was valid; yet *Richard* and *Mark Steere* purchased and held the lands in *trust* for *Stephen Steere*, their father, after payment and satisfaction of their advances, costs, and expenses. That this *trust* was clearly demonstrated by the written evidence in the case. He cited *Forster* v. *Hale*, 3 *Vesey*, jun., 696. 707, 708. 710. *Tawney* v. *Crowther*, 3 *Bro. C. C.* 318. *O'Hare* v. *O'Neil*, *Bro. P. C.* 227. *Forster* v. *Hale*, 5 *Vesey*, 308, 309, 310. 315. *Roberts on Frauds*, 102. 1 *Johns. Ch. Rep.* 302. 591. *Green* v. *Stephens*, 17 *Vesey*, 74.

The *parol* evidence as to the trust, he contended, ought to be rejected.

*Van Buren*, contra, insisted, 1. That no trust had been established by the written evidence; and that if the *parol* evidence was admitted, it clearly destroyed the alleged trust. He cited 12 *Vesey*, 67. 5 *Vesey*, 308.

2. That the plaintiffs had adequate relief at law, as to the property, the title to which had not been confirmed by their ancestor; and admitting that there was a balance due to them from the lands, the sale of which had been confirmed by their father, the plaintiffs were not entitled to it, as it had not been devised to them. 6 *Term Rep.* 610. *Cowper*, 660, 661. *Doug.* 759.

3. That the surplus arising from the sales so confirmed

by the father of the plaintiffs, being personal property, the bill should have been filed by the executor, or those entitled under the statute of distributions.

The cause stood over for consideration to this day.

THE CHANCELLOR. The bill charges that the purchase by the defendants, *Richard* and *Mark Steere*, at the sheriff's sale, on the 16th of *August*, 1805, was in trust for the plaintiff's testator, and those defendants are called upon to account to the plaintiffs, as devisees, for the rents and profits, and for the proceeds of that part of the lands which have since been conveyed to others, and to reconvey to the plaintiffs that part of the lands which they still retain.

It is intimated in the bill, and it was made a point at the hearing by the counsel for the plaintiffs, that the sheriff's sale was void, and that the deed in pursuance of it was invalid, for want of designation and description of the lands sold. If this were so, then the plaintiffs, as devisees of *Stephen Steere*, the original owner, in *August*, 1805, would have their fit and adequate remedy at law, for the lands now sought by the bill. In respect to any claim for the proceeds of the estate, I apprehend the executor of *Stephen Steere* ought to have been a party to the bill; for these proceeds in the hands of the defendants were personal property, and if they were bequeathed at all to the plaintiffs by the will, (which cannot very readily be admitted,) the executor is the proper person to call the defendants to account, and to distribute the personal estate under the directions of the will.

But I shall not dwell upon this difficulty in the case, but proceed at once to the examination of the question on which the whole foundation of the bill rests, viz. is there a trust sufficiently manifested in writing, to be recognized and enforced in this Court?

To take the case out of the statute of frauds, the trust must appear in writing, under the hand of the party to be charged, with absolute certainty as to its nature and terms,

before the Court can undertake to execute it. The words of the statute of frauds are, " That all declarations or creations of trusts or confidences, of any lands. &c. shall be manifested and proved by some writing, signed by the party who is, or shall be by law enabled to declare such trust, or by his last will in writing, or else they shall be utterly void, and of none effect." A trust need not be created by writing, but it must be manifested and proved by writing; and the doctrine in *Forster* v. *Hale*, (3 *Vesey*, 696.) is that the nature of the trust; and the terms and conditions of it, must sufficiently appear, so that the Court may not be called upon to execute the trust in a manner different from that intended.

In this case, the testator, *Stephen Steere*, at the age of seventy, was much in debt and embarrassed ; and among other debts there was a judgment against him, amounting with interest and costs, to 1,400 dollars. He was utterly unable to satisfy it, and his lands in the county of *Chenango* were advertised for sale on execution. He had eleven children, at the time, and the defendants, *Richard* and *Mark Steere*, (who were two of them,) attended the sale and purchased the property for 1,600 dollars, and advanced the money out of their own funds, and took the sheriff's deeds in their own names. This was in *August*, 1805, and it appears to have been a fair purchase at public auction. The natural consequence of such a transaction is, that these two sons would not be inclined to speculate upon their aged father's misfortunes, and make a profitable bargain to themselves, to the injury of him and his other children. Considerations arising from the ties of blood and the dictates of family affection, would ordinarily lead such a purchaser to offer to restore the property, on being reimbursed his advances and indemnified for his trouble, or else to engage that all the profits of the purchase should be applied justly, and equitably, to the common benefit of the family But intentions and intimations of that kind cannot well be considered as amounting to a clear and

absolute trust, which a Court of equity will recognize and enforce, unless the declaration of it be quite positive and free from all ambiguity. Parents will usually make declarations and express intentions of holding their property for their children, but a technical trust would not easily be deduced from them, unless they were contained in a last will and testament made on purpose to dispose of the estate. It would be injurious to that freedom of intercourse, and to the operation of those kind and generous affections, which ought to be cherished in the circle of the domestic connexions, to make such deductions from loose and general expressions, in a confidential correspondence between one member of a family and another, and to give them the force and rigour of legal obligations. It ought also to be remembered, in respect to the obligations resulting from family connexion, and the effect to be given to them in courts of justice, that the *duty* of benevolence, to borrow an expression of Lord *Kames*, is much more limited than the *virtue. Sanguinis conjunctio benevolentia devincit homines et caritate.*

The first item of testimony from whence the plaintiffs' undertake to show the trust, is a letter from the defendant, *Richard Steere*, to *Asel Steere*, dated *October* 19th, 1806, upwards of one year after the purchase under the sheriff's sale. This letter is not addressed to the testator, whom the bill alleges to have been the *cestui que trust*, and in that respect it differs essentially from the evidence from which a trust was deduced, in the cases of *O'Hare* v. *O'Neil*, (2 *Bro. P. C.* 39.) and *Forster* v. *Hale*. (3 *Vesey*, 696.) It is addressed to a stranger to the alleged trust, though a brother of the defendant, and it was evidently a letter on private and confidential business. The letters in the other cases were addressed to the *cestui que trust*, and there was then a reasonable ground of inference, (which is wanted in this case,) that the writer of the letter *intended* to give a manifestation or evidence of the trust. This same *Asel Steere* declares, in

*1820.*

STEERE
v.
STEERE.

his answer, that the understanding between him and the de-·
fendants, *Richard* and *Mark Steere*, was, that the land was
not to be reconveyed to the testator after the repayment of
the money advanced and their expenses and trouble, but that
the surplus should be held for the testator and his wife, and
the seven children then residing in *Chenango* county.

This letter corresponds with the general view of the case,
as given by *Asel Steere*, in his answer, and shows evidently
that *Richard Steere* considered himself as holding the land,
in the first place, for his reimbursement, and then, under
some general and vague promise, to distribute the surplus
among his brethren of the family. He says, he inferred
that to be his father's wishes, even before he purchased, and
that the land should go " to the family, and not to strangers. '
He says, therefore, he made " a promise to many of the
family, that it (the land) should not go out of his hands
without their having a part," and that he was not willing
to " break his promise with his brethren."

The next letter addressed to *Asel Steere*, is dated *July* 9th,
1807, in which he says, his father "wished him and his bro-
ther *Mark* to reconvey back all the land except the *Una-
dilla* purchase." This, he said, he could not then do, be-
cause he could not " perform his engagements with his
brethren and give his father satisfaction." The third letter
of this defendant is dated *August* 8th, 1809, and is address-
ed to three of his brothers, of whom the plaintiff *Timothy*
is one, and is material only for the idea which prevails
through all the letters, that he and his brother *Mark* held
the property for their security and for " the family."

There is not, therefore, in either of these three letters,
any sufficient manifestation and evidence of the specific
trust charged in the bill. The trust charged is in favour of
*Stephen Steere*, the testator, but the trust vaguely intimated
in these letters is one in favour of the family at large of
*Stephen Steere ;* and admitting a trust to have been duly
manifested in favour of the children of *Stephen Steere*, (and

this is an admission which the evidence does not demand, for the suggestions and intimations in the letters are too indefinite and loose to be the foundation of a bill for specific execution,) yet the bill calls upon the Court to support the will of the testator, and to " execute the trust in a manner very different from that intended." This, Lord *Alvanley* admits, cannot be done.

The strongest evidence in favour of the trust charged, is contained in the letter from the defendant, *Richard Steere*, to his brother, the defendant, *Mark Steere*, dated *February* 12th, 1814, inclosing the account of these two defendants against *Stephen Steere*, of the date of *January* 28th, 1809.

In that account, *Stephen Steere* is charged as a debtor, with payments by *R.* and *M.* to the sheriff, at the time of the purchase by them in *August*, 1805, and with some expenses in relation to that business, and he is likewise credited with the sale of part of the lands held under the sheriff's deed. He says in the letter that the original account was sent " for the satisfaction of *Stephen* and *Timothy Steere*," and that " the old account had been agreed to by father."

The defendants, in their answer, admit, that the account of 1809 was once, and only once, shown to *Stephen Steere*, and then casually, and that it was made up with the intent to show how expensive the estate had been to them, and what advances had been made, and that it was made up from loose papers now mislaid, or in possession of the plaintiffs, and that the name of *Stephen Steere* was used as a debtor for convenience, and to distinguish the real estate derived from the sheriff's deed from the other estate of the defendants, and because the estate was looked upon as a family patrimony, in which the family expected to share. They aver in their answer, that the account was made out for the satisfaction of the plaintiffs and the family, and to show that further demands were unreasonable, and that the account of 1809 was retained by them, as a private memorandum, until *February*, 1814, and that additions were made to it from

1820.

STEERE
v.
STEERE.

time to time, to assist in the gratuitous dispositions of the property among the family.

These explanations were given in answer to interrogatories specially pointed to those accounts, and by which they were required to answer, " whether the said accounts were not made out in the usual form of accounts."

It appears to me that the explanation is consistent with the proof applicable to those accounts, and with the general complexion of the entire transactions of the estate.

*James Birdsall,* a witness, states that in *January,* 1814, the defendants, *Richard Steere* and *Mark Steere,* entered into a parol agreement in relation to the lands so purchased at the sheriff's sale, with their brothers, *Stephen Steere,* jun., and the plaintiff, *Timothy Steere.* The substance of the agreement was reduced to writing, at the time, by the witness, at the request of the parties to it, and was approved of by them. That agreement was considered as a final settlement of all questions and claims in respect to that property, and it provided for a distribution of what remained of the estate, among certain of the children. The *memorandum* begins with these words : " *Richard Steere* will state his account to *Mark, Stephen,* and *Timothy Steere :*" and here we have the origin of the publication of the account produced by the plaintiffs as evidence of the trust. The account was sent to *Mark Steere,* in the letter of *Richard Steere,* of the 12th of *February,* 1814, and now we can understand the meaning of that paragraph in the letter, in which he says, " I send the original account for the satisfaction of *Stephen* and *Timothy ;*" and also the force of another paragraph in which it is said, " so you will see by my statement that you will pay me and retain 110 acres on the south side of the way, to pay you and *Stephen,* and *the remainder to divide.*"

This account and letter could not have been intended as a manifestation or declaration of a trust in favour of the testator. The manner in which it arose, and was transmit-

ted, and the contents of the letter, are pretty satisfactory proof, that the explanation given of the account in the answer is the just and true explanation, and the only one of which the whole transaction is susceptible. The way in which these accounts came to the knowledge and possession of the plaintiffs, was by taking copies of the originals while in the hands of the defendant *Mark Steere*, and there was never any free and voluntary delivery for the purpose to which they have been applied. The only part of the letter which shows that the defendants considered themselves as acting in the purchase and management of the estate, as trustees for their father, the testator, is the expression that " the old account had been agreed to by father." This probably referred to the account of 1809 ; and though a loose paragraph, it would be difficult to understand it in any other sense than as an admission of the trust sought after, if it was not accompanied with other paragraphs in the same letter absolutely inconsistent with that fact. The account was sent only for the satisfaction of the two sons, (of whom the plaintiff *Timothy* was one,) and in pursuance of an agreement to distribute the surplus property among the children. The letter says, that after *Mark's* and *Stephen's* debts were satisfied, *the remainder was to be divided.* The whole letter must be taken together, and one expression checked and balanced by another. And when we take into consideration the manner in which that real estate had been dealt with by these two defendants, for ten years together, under the eye, and with the approbation of their father, the notion of any other trust than that founded upon brotherly good will, spontaneous promises, and gratuitous acts of benevolence to the family at large, including their father and all his other children, is utterly inadmissible. We have conveyances from the defendants of parts of the estate between 1809 and 1815, to strangers, for a valuable consideration, and to several of the children, as gifts, and

1820.

STEERE
v.
STEERE.

all these acts confirmed by the testator. The agreement of 1814 was partly executed by the defendants, and the several voluntary transfers to the children, to the amount of 5,000 dollars in value, are decisive proofs, that the defendants have acted according to their original suggestions and intentions of applying the surplus property, after their indemnity, to the benefit of the family. The idea of a technical trust binding in equity in favour of the father, was never heard of in the family, or put forward by any branch of it, until after the two plaintiffs, *Thomas* and *Timothy Steere*, had obtained from *Mark Steere* copies of the accounts above referred to. I cannot easily reconcile this claim with good faith, after the agreement of 1814, and the extent to which it had been carried into execution by the defendants *Richard* and *Mark*. It also strikes me, considering the manner in which the purchase had been received and treated by the family of the testator, from the time it was made, down to the testator's death, and the many gifts and conveyances which the family have been content to receive at the hands of the defendants, that to enforce a strict trust with all the legal responsibilities attached to it, according to the doctrine of the bill, would be extremely unjust and oppressive.

A question has been raised, whether the parol evidence given in the case be admissible, to contradict the inference drawn by the plaintiffs from the accounts and the letters. If the written proof was clear and positive, it could not be rebutted by parol proof; but considering the loose and ambiguous nature of it, I am inclined to think the parol evidence is competent in support of the sheriff's deed, and to explain the obscurity of the case, by showing what was the understanding of all the parties concerned. In *Forster* v. *Hale*, parol proof was received, and taken into consideration by the Master of the Rolls, in forming his opinion; and in *Redington* v. *Redington*, (3 *Ridgeway's Cases in the Irish*

*Parliament,* 182.) parol evidence was held, by Lord *Clare,* to be admissible to support a deed in the name of the son, but inadmissible to create a trust against it. The cases of *Lamplugh* v. *Lamplugh,* and of *Taylor* v. *Taylor,* (1 *P. Wms.* 111. and 1 *Atk.* 386.) were referred to by the Lord Chancellor of *Ireland,* in confirmation of this principle. The parol proof in this case puts an end to all pretension of a trust in favour of the testator, and shows that by the acknowledgment of the testator and of all the family, the purchase at the sheriff's sale was absolute, without any trust or qualification whatsoever, and that none was ever heard of, or suggested in the family, until about the time that the testator made the will, giving all the undisposed part of the estate to the plaintiffs. It was the uniform and universal understanding in the family, for ten years, that the property was not to be reconveyed to the father, but was to be held, in the first place, for the indemnity of the two purchasers, and then, it was submitted to their discretion and justice, in what manner and mode, and to what extent, the surplus should be appropriated to the wishes and wants of the family. I am aware, however, of the dangerous nature of such proof, and should not willingly rest upon it, if it did not appear to corroborate the reasonable inferences to be drawn from the written testimony in the case.

I do not perceive any ground for a distinction between the case of the estate generally, and the *Cole* and *Glover* lots. If any trust exists as to them, distinct from what is attempted to be established as to the rest of the estate, it is a trust by implication or operation of law, and such a trust cannot be made out but by showing the actual payment of the money by the *cestui que trust,* or an actual loan by him for that purpose; and in this case no such payment or loan is pretended. The mere charge of the payment to the third person who sets up the trust will not be sufficient; and actual payment, or an actual loan of the money *at the time,*

and not subsequent to the purchase, is indispensable. (2 *Johns. Ch. Rep.* 409.) " If you merely employ a man by parol," says Mr. *Sugden*, " to buy an estate for you, although he buy it accordingly, yet if he hold himself out as the real purchaser, and no part of the purchase money was paid by you, you cannot compel him to convey the estate to you, because that would be directly in the teeth of the statute of frauds." And if the entry in the account communicated to *Mark Steere*, in 1814, be assented to as evidence in writing of a trust, it is no longer the case of a resulting trust, but rests precisely upon the same ground with the general trust set up by the bill, and must partake of the same fate.

I am, accordingly, of opinion, that the bill cannot be sustained, because,

1. The plaintiffs, upon their own showing, have a remedy at law for the land possessed by the defendant *Richard Steere*, inasmuch as neither the sale nor the sheriff's deed contained any description or location of the land sold.

If, however, the plaintiffs, or the testator under whom they hold, may be considered (and I think he may justly) as having waived that objection, and as having affirmed the sale, by repeated acts, then,

2. The plaintiffs have not made out a trust sufficiently clear and certain, to enable this Court to act upon it, and to take the case out of the statute of frauds.

Bill dismissed without costs.