## PRATT VS. AYER.

1. TRUSTS — EVIDENCE.—Express trusts in lands, or such as are created by agreement of the parties, must be evidenced by writing, and parol proof is not admissible to establish them. *Rogan v. Walker*, 1 Wis., 527; *Orton v. Knab*, 3 id., 576.

2. SAME. — The existence of a trust need not be declared in express terms; but it may be proved by any proper written evidence; by an answer, or by a note, letter or memorandum in writing, disclosing facts creating a fiduciary relation. *White v. Fitzgerald*, 19 Wis., 480.

3. SAME — CONTRACT. — Previous to a government land sale, O. had taken possession of certain government lands and made valuable improvements thereon, with the intention of purchasing them when put in market. Not having the money with which to purchase at the land sale, it was agreed between him and A. that A. should purchase the lands, and that if A. would purchase, he would enter into a contract with A. to pay him $800 therefor, being double the cost of the land, and A. having purchased the lands, a written contract was executed between them by which, in consideration of $1.00, part of the purchase money therein mentioned, and on condition that O. would pay A. $800 in five years thereafter, with annual interest, and would pay all taxes on the lands in the meantime, A. covenanted to convey the lands in question in fee simple to him, and O. remained in possession until he assigned his interest to P., the complainant: *Held*,

    1. That the written contract between A. and O. disclosed the essential particulars of a trust, by which the title to said lands had been taken by A. in trust for O., so as to take the case out of the statute of frauds; that parol proof of the circumstances under which the contract was

Pratt vs. Ayer.

executed was admissible, but that in the absence of such contract, parol proof, however strong and clear, could not be received to establish the trust relation.

2. That the entry having been made by A. upon the promise that O. would enter into the contract in question, and having so entered into it, furnished a sufficient consideration for the agreement of A.

3. That O. was the real, though A. was the nominal purchaser, and the contract was therefore not in contravention of the act of congress of March 30, 1830, prohibiting agreements with any person or persons proposing to purchase, to pay or give such purchaser a sum of money over and above the price for which the land might be bid off.

4. That the execution of the contract in accordance with the terms and conditions of the previous parol agreement of A. to enter the land and hold the title in trust for O. was sufficient to take the case out of the statute of frauds, and with proof the attending circumstances to entitle O.'s assignee to the execution of the trust.

5. That neither O. nor his assignee could maintain of the transaction that it was usurious, and claim a conveyance of the land merely for the amount A. paid for it, with lawful interest; that the trust would be executed by the court upon the payment of the sum stipulated in the contract, with interest.

(3 Chand., 265.)

APPEAL from the Circuit Court for *Milwaukee* County.

The complainant, *Pratt*, filed his bill November 14, 1846, stating in substance, among other things, that at and prior to the land sale in the Milwaukee land district in October, 1839, one Isaac C. Owen was in possession of the east half of section 33, town 6, range 19, then being United States land, in Milwaukee county ; that Owen had made improvements on it, and wanted to purchase it of government at the sale, but had not the money to make the purchase; and that he applied to *Luther Ayer*, the defendant, for a loan of sufficient money to make the purchase at $1.25 per acre, being $400 ; and that prior and about the time of the land sale, that said *Ayer* agreed verbally to loan said Owen the money upon the conditions that said Owen should let the land be bid off by said *Ayer*, and the title be taken in the name of said *Ayer*, and that said Owen should take a contract from said *Ayer* for the purchase of said land from him, and should thereby agree to pay him

for said land $800 in five years, with annual interest thereon at
7 per cent. ; and that in pursuance of said verbal agreement
said *Ayer* did purchase said land at said sale for $1.25 per acre;
and that after said purchase on the 17th of October, 1839,
said *Ayer* did give said Owen a written contract to sell him the
land on the time and terms before set forth; the particulars
of which contract, excepting the forfeiture clause, are set forth
in the bill, by which Owen covenanted to pay the money, and
*Ayer* covenanted to convey and warrant the title to the land.
The bill states that the premises are now worth more than
$2,500, and that the complainant, *Pratt*, is the lawful assignee
of said contract and said Owen's rights under it, and also that
said *Ayer* has received some of the interest money due on said
contract; also, that after the assignment to *Pratt*, to wit: in
March, 1845, said *Pratt*, by his agent, called on said *Ayer* and
tendered him the sum of $556, which was the cost of the
land at $1.25 per acre, with interest thereon to that time, and
demanded a deed of the land from said *Ayer*, which tender and
deed were refused by said *Ayer*. And the complainant alleged
that he then was and always had been ready and willing to pay
the sum of $400, the cost of the land at $1.25 per acre, with
interest at 7 per cent., upon obtaining the deed of said land
from said *Ayer*. In addition to the general prayer for relief,
the bill prays for a specific performance of the contract, that is,
for the conveyance of the land to the complainant with cove-
nants of warranty, upon the payment by the complainant to
the defendant of $400, with the interest.

The defendant, in his answer to the bill filed on the 17th day
of August, A. D. 1847, states that the defendant does not
know whether Owen was in possession of said land prior to the
said land sale or not, but denies that there were any improve-
ments of much value thereon, prior to that time, or that there
were any of permanent advantage to the premises, and that
said Owen ever applied to him for a loan of money to purchase
said land with, at said land sale, but admits that a short time

before said land was sold by the United States, that is within a few days before the sale, said Owen did come to him, and wished to make some bargain by which he, *Ayer*, should buy the land of the United States, but that he refused to make a bargain with him about it, and told him he could not and would not make any bargain about government land before the sale; and that Owen replied, as he thinks, that he could not buy it himself, and that defendant might as well buy it as anybody. He denied that he ever agreed to loan said Owen the sum of $400 upon the condition that the land should be purchased in defendant's name, and that Owen should take a contract for the purchase of the same from defendant as stated in said bill, or upon any conditions whatever, and denied that there was any bargain made between him and Owen about the land, until after he had purchased the same of the United States; that he was buying government lands at that time generally, for the purpose of selling them at an advance, and realizing the profit from an increase in their value, and he admitted that a short time after he bought said land of the United States, on the 17th day of October, 1839, he did make a contract in writing with Owen to sell him the land on time, which contract in part is set forth in said bill of complaint, but not the whole of it. The contract is set forth *verbatim* in the answer, and the part omitted in the bill is as follows: "Provided always, and these presents are upon this express condition, that in case of failure in the performance of either of the covenants or agreements, on the part of the said party of the second part (said Owen) to be performed, the said party of the first part (said *Ayer*), his heirs, executors, administrators and assigns, shall have the right to declare this contract void, and thereupon to recover by distress upon the said premises or otherwise, all the interest which shall have accrued upon this contract, up to the day of declaring it void, as rent for the use and occupation of said premises, to take immediate possession thereof, to regard the person or persons in possession on such

termination of the contract as a tenant or tenants holding over without permission, if that should be necessary, to regain the prompt possession of the premises and to recover all damages sustained by reason of any unnecessary destruction of the timber or trees growing on said premises, or by holding over without permission."

The answer further states, that on the 30th day of November, 1844, more than one month after the principal money and interest on said contract had all become due, the defendant went to said Owen and demanded payment of the same, which was refused, said Owen saying that he had not the money and could not pay the same; whereupon the defendant, in the presence of witnesses, directed said Owen to leave the premises, and declared the said contract void, according to the tenor and provisions of the proviso in said contract; that this was about four months before the tender of $1.25 per acre and interest, stated to have been made in the bill of complaint. The answer admits that the premises are now worth about $2,000, but denies that the improvements made by Owen and those holding under him have added to the value of said premises, but on the contrary have been an injury to the same, by the destruction of rail and other timber which have been taken from said land, and denies that there had been any payment of principal or interest moneys to him on said contract, and alleges that the defendant has paid a portion of the taxes on said premises, and denies that the tender in March, 1845, as stated in said bill, was an actual tender, inasmuch as the money was not all counted out and offered to him.

The complainant filed a replication, and proofs were taken. The facts established, so far as they are material, appear in the opinion of the court. The circuit court decreed for the complainant, and that upon the payment of the amount due *upon the written contract*, of which an account was to be taken, the defendant *Ayer* should convey the premises to the complainant *Pratt*, and in default of such payment the complainant *Pratt* be

foreclosed and barred of all right, title and interest in the premises, and from this decree the complainant *Pratt* appealed.

*J. E. Arnold*, for appellant, argued that courts of equity for the protection of borrowers, who are supposed to be *in vinculis* to lenders of money, will lean toward the construction of all contracts as loans, where there is an apparent taking of illegal interest, and regard all conveyances of property as mortgages where there is an apparent security for money, and are bound to look at the substance, and not the forms of transactions. 7 Barn. & C., 453. In *Lawly v. Hooper*, 3 Atkins, 379, Lord HARDWICKE said, "there has been a long struggle between the equity of this court, and persons who have made it their endeavor to find out schemes to get exorbitant interest, and to evade the statutes of usury. The court very wisely hath never laid down any general rule beyond which it would not go, lest other means of avoiding the equity of the court should be found out. Therefore they always determine upon the particular circumstances of each case, and wherever they have the least tincture of fraud, in any of these oppressive bargains, relief has always been given." *Grimes v. Schreeve*, 6 Monroe, 553. Usury is the subject of the intention of the parties, which must be ascertained from the whole evidence. If it depends upon the construction of a written paper, such construction is the peculiar province and duty of the court. 9 Peters, 378. The test of usury is whether the substance of the transaction is really a loan of money or the creation of a debt, whatever may have been the form of the contract; and if it be a loan, then whether the lender or payee has stipulated for or secured to himself by means of the loan, and arising from it, or from anything connected with it, and forming a part of the same transaction, any profit or pecuniary advantage he would not otherwise have been entitled to, exceeding the rate of interest allowed by law. Blyd. on Usury, 254; *Dowdall v. Lenox*, 2 Edw. Ch., 267. There must be a lending and borrowing; but if, upon an application to borrow money, a contract for purchasing

property at a low price is made, with the privilege of repur-
chase, at a price enhanced beyond the legal interest (the first
person sustaining no real hazard), it will be considered a device
to evade the statute of usury. Blyd. on Usury, 181, 188 ;
*Lytle v. Logan*, 1 Marshall, 529. Every shift, device or sub-
stitute, which the ingenuity of man can invent to take unlawful
interest, either directly or indirectly, or by any shift, or deceit-
ful way or means, is included in the provisions of the statute.
Neither are cases of usury confined to precise loans of money,
but they extend to cases where the relation of debtor and cred-
itor exists, etc. Blyd., 185 ; 1 Scho. & Lef., 191 ; *Stackell v.
Etheall*, 3 Gill. & Johns., 123 ; Blyd., 198 ; *Bank of Valley v.
Stritling*, 7 Leigh., 26 ; Blyd., 295.

In order to render a contract usurious, there must be, 1. A
loan, either expressed or implied. 2. An understanding that
the money lent shall be returned at all events. 3. That not
only the money lent shall be returned, but for such loan a
greater than legal interest shall be paid or required. Blyd.,
84. It is not necessary to the creation of a loan that money
should be paid on the one hand and received on the other ; for
the circumstance of a man's money remaining in another's hand
in consequence of an agreement made for that purpose, will
equally constitute a loan. Blyd., 84, 85 ; 1 Cowper, 113 ; 1
Vesey, 531 ; 3 Term, 425; 17 Mass., 258. Three things are
necessary to constitute usury : a loan, taking more than legal
interest, and a corrupt agreement. *Bank of Utica v. Wager*, 2
Cowen, 712.

In all questions touching usury, the inquiry is this: Were
the advantages or remuneration stipulated for in consideration
of the loan of money, and if so, are they greater than the rate
of interest allowed by law? Blyd., 192 ; *Daquin et al. v. Cai-
ron*, 3 L. R., 393; Blyd., 156 ; *Ely v. McClung*, 4 Port., 128.
An agreement to take even a legal rate of interest on a larger
sum than is really due is usurious. Blyd., 193 ; *Flaoer v. Mil-
landon*, 19 L. R., 185. A contract to receive a reasonable com-

pensation for indorsing the notes of another, payable at the bank, is not of itself usurious, though as such contracts are liable to be perverted to usurious purposes, they are to be viewed with great jealousy. *Beckwith v. The Windsor Manufacturing Co.*, 14 Conn., 594; Blyd., 171. To take a compensation exceeding the lawful rate of interest for obtaining money at a bank on one's own security for the use of another is not usury. *Hutchinson v. Henner*, 2 Conn., 341; Blyd., 167. In the case of *French v. Brown*, 2 Atk., 120, there was a private agreement between mortgagor and mortgagee, that the latter should have a commission for his trouble in receiving the rents and profits. This might not be strictly usury, but Lord HARDWICKE refused to allow the mortgagee anything more than his principal and interest. 5 Serg. & Rawle, 51; 7 Paige, 581; 13 Peters, 65; 5 Johns. Ch., 122; 16 Johns., 367.

Another question arising in the case is, Whether by the usury laws of Wisconsin, then in force, the contract is wholly void, or *Ayer* is entitled to recover the amount actually advanced by him, with legal interest? On this subject the decisions in the several states have been governed by their respective usury laws. Although some cases decided by the supreme court of the United States seem to raise the inference that all usurious contracts are void, and cannot be enforced, yet in the case of *De Wolf v. Johnson*, 10 Wheat., 367, which arose under the usury law of Rhode Island (which is very similar to the law of Wisconsin just cited), the court held that it would not refuse its aid to recover the principal.

The bill in this case is filed by the borrower. In this case, *Pratt*, being the grantee and representative of Owen, stands in his place, and is entitled to his rights and privileges. *Fenno et al. v. Sayre*, 3 Ala., 458; Blyd., 157; 9 Paige, 139. All that is required of him is to offer to pay the amount actually loaned, with interest. Blyd., 124.

*E. G. Ryan*, for appellee:

I. The contracts in these cases, viewed as the complainant

views them, were not usurious in law. Interest was con-demned by the earlier dogmas of the catholic church; but the habit of receiving it is moral and beneficial, according to the legal and ethical doctrines of several ages past. 2 Black. Com., 454. At common law, interest was the subject of contract, without legal limit; although Lord HALE is reported to have said (Hardres, 420), "Jewish interest was prohibited at com-mon law, being 40 per cent. and more, but no other." But the first English statute in restraint of interest was 37 Henry VIII, ch. 9; 2 Black. Com., 463. That statute simply provided that "none shall take, for the loan of any money or commodity, above the rate of ten pounds for one hundred pounds for one whole year." This, as BLACKSTONE says, was a statute to con-fine interest to 10 per cent. The alleged interest taken in the cases at bar was less than 40 per cent. per annum; so that in any view of the common law, the contract was a fair and legal contract at common law. The statute in force to affect the contract was the "act relating to interest." Rev. Stat., 1839, 156. This statute was in restraint of the common law right of taking interest. It declares 12 per cent. legal and valid; allows 7 per cent. as a legal incident; and subjects any one taking more than 12 per cent. to an action of assumpsit for three times the excess, to be brought within a year after the payment of such excess.

1. This statute differs from the English and almost all of the American statutes. They prohibit the contract; this does not prohibit the contract, which at common law would be and so remains legal, but attaches a specific liability to the receipt. By the English and other statutes, all usury is in the contract. By this statute there is no usury by contract; usury lies in the receipt of the money. *Fleckner v. U. S. Bank*, 8 Wheat., 338; *Thomas v. Cleves*, 7 Mass., 361; *U. S. Bank v. Waggener*, 9 Pet., 379; *Stevens v. Lincoln*, 7 Met., 525. It is no answer to this to say that because a statute affixes a pen-alty to an act, it prohibits the act. For, *firstly*, this act does

Pratt vs. Ayer.

not affix a penalty, but only gives a remedial action; and *secondly*, even if it be a penalty, it is only for the receipt of the excess. Thus the penalty would operate only to prohibit the actual receipt, and not the contract. And under this act, the contract remains as it was at common law, legal and valid; but the actual receipt of more than 12 per cent. subjects the receiver to an action. And the distinction is a substantial one. By the English, New York and other statutes, a note of $100 payable in one year with 25 per cent. interest is illegal. Usury is in the contract. But by the statute of 1839, there is no usury in the contract; receiving the whole money and interest at the end of the year subjects the receiver to the action. But if the payee waits until the 25 per cent. for the one year, with 7 per cent. for succeeding years, amounts to 12 per cent. per annum only, he may receive without incurring a liability to the action. In these cases, the defendant had not received but refused to receive, the money or the interest. And the greatest length to which a court of equity could possibly go under the act of 1839 would be to restrain him from enforcing the payment of money he would be afterwards compelled to refund.

2. But even this ground of interference of a court of equity is denied. Without this statute there would have been no remedy or relief against the contract. The act gives the relief and provides a specific remedy, and where a statute confers a right and provides a remedy to enforce it, no remedy can be pursued other than that furnished by the statute. *Almy v. Harris*, 5 Johns., 175; *Edwards v. Davis*, 16 id., 281, 285; *Lang v. Scott*, 1 Black., 405; *Renwick v. Morris*, 7 Hill, 575. Under this statute, the specific action for three times the excess is exclusive of all other remedies. For these reasons it is contended that the jurisdiction of courts of equity over cases of usury, upon which the complainant founds his claim to relief, does not apply to the cases at bar; and that the bill should have been dismissed upon the hearing.

II. The contracts in these cases, as exhibited in the pleadings and proofs, were not usurious in fact. If usurious, they were so *before* the government land sale. Because if the contracts date *after* the land sale, they were contracts for the sale of the defendant's land, and not for the loan of money. And before the land sale the contracts were not usurious.

1. Because they rested upon executory agreements, and there was no debt incurred by the complainants. Blyd., 84, 85; *Spurrier v. Mayos*, 4 Brown Ch., 28; 1 Vesey, 527. If the agreements were *before* the land sale had been made, and the defendant had purchased the land, and the complainants had refused to execute the contracts, they could not have been compelled to do so, even if the agreements had been to repay the defendant the government price only. The previous agreements were unexecuted verbal agreements for the sale of land, and void under the statute of frauds. Up to the time of the execution of the written contracts, the complainants had incurred no liability to the defendant. There was then no usury *before* the land was purchased by the defendant. When he had purchased it, he was under no legal obligation to convey it. The land was his, and he had the right to sell it to *any* person, at *any* price. Therefore no taint of usury passes from the void agreement *before* the land sale, to the valid contract made *after* it. No rule which has ever been held for the admission of parol evidence to establish usury in a deed will affect this argument. Because the relations of the parties to the subject changed between the first verbal agreement and the subsequent written contract. No case has been found where parol evidence was admitted of facts antecedent to the *status* of the parties at the time of the written contract. Where a verbal agreement is made under a legal disability, and that disability is removed before the written contract is executed, no rule ever permitted the original disability to affect the contract. In these cases, the agreement before the land sale is *nudum pactum*, both as a contract and as a matter of intention to affect the written contract.

2. The agreements before the land sale were not usurious, because they were not for the payment of money *at all events*. Blyd., 85; *Worthy v. Pitt*, 1 Vesey, Sr., 164. Now the defendant paid his money, not to the complainants as a loan, but to the United States for their land. Even if there had been a liability on the part of the complainant to pay before the land sale, and even if the prior agreement was not void, still the liability depended on a contingency, the defendant's purchase of the land at the land sale, which might not happen ; and there was no liability to pay *at all events*. This argument applies even to the written contract; for by it the money was not to be paid at all events; for there is in it a right of declaring the contract void upon nonpayment. This right the defendant has assumed to exercise ; he has absolved the complainant from the payment; he could not therefore sue him on his covenants. And yet after all this, the complainant seeks to be relieved against a usurious liability. This is a fair illustration of the rule, that in order to constitute usury there must be a subsisting contract for the payment of money at all events.

3. The agreements before the land sale were to buy at government price and sell at $2.50 per acre. Here was a contingency of which the defendant run the risk. The government price was the highest bid at auction; if bound to convey at all, the defendant was equally bound whether he purchased for ten shillings or for ten dollars. This risk avoids all idea of usury.

4. By the very terms of the agreements, they were not usurious. Here is not the case of men wanting money ; the complainant wanted land, not money. The land belonged to a third party who was about to sell it for cash. He applies to the defendant to buy the land. He agrees to buy for cash and sell for credit. A. owns land which he purposes to sell at auction for cash. B. desires to purchase it, but has no money; he applies to C. who has money, to buy for cash and sell to him on credit, which C. does. This is not usury.

See *Spurrier v. Mayos*, Blyd., 41; *Beete v. Bidgood*, 7 Barn. & Cres., 453; 14 Eng. C. L., 80. The possession of the complainant will not aid his case; for he was a mere trespasser.

5. Construing the verbal agreement and the written contract together, it is not a simple agreement to purchase the land and release the title received. These contracts bind the defendant to convey, with covenants of warranty. The prayer of the bill for a more limited covenant cannot modify the contract or affect the transaction. Covenants of title in a conveyance of land constitute a legal consideration to support a promise to pay money. Here the defendant not only bought and sold, but assumed the hazard of the title. He was to bind himself and his representatives forever to maintain and insure the title he should convey. The defendant sold more than he bought; his covenants were to go to the complainant, with the land that he bought. That the purchase was made by him from the United States does not alter the position. The transaction and its legal and equitable construction are the same as if he bought from John Doe or Richard Roe. The title received by the defendant from the United States was imperfect and inchoate, and subject to be defeated. If defeated, his liability to the complainant remained and accrued. And the purchase money to be paid by the complainant, with interest, would be, by any rule applied to covenants of warranty, the lowest measure of his liability upon breach of the covenants by failure of title. For these reasons, it is believed that the contracts were not usurious, but fair and legitimate agreements, to be enforced in all courts according to the *bona fide* intentions of the parties.

III. As has been seen already, the taking of over 12 per cent. was only prohibited by the forfeiture in the act of 1839. And this forfeiture did not accrue till the actual receipt of the surplus. The act of 1839 was repealed on the 1st of May, 1849 (R. S., ch. 45, ch. 156). At the date of the repeal the defendant had not received the excess, and no forfeiture had accrued.

And after the repeal, there was no statute by which the forfeit-
ure could accrue.   So that at the date of the decree the defend-
ant might have received any per cent. per annum, without in-
curring any forfeiture.   And as there was no prohibitory clause,
and no forfeiture, there was no provision of law to found the
idea of usury upon.   *Com'th v. Marshall*, 11 Pick., 350; *Lewis
v. Foster*, 1 N. H., 61; *Butler v. Palmer*, 1 Hill, 324; *North
Canal Street Road*, 10 Watts, 351.

IV. If the agreements before the land sale be construed as
agreements to buy at $1.25 and sell at $2.50, then they and
the subsequent written contracts are void, under the legislation
of the United States.   See act of 31st of March, 1830, 4 Stat-
utes at Large, 392; also act of 3d of March, 1807, 2 Statutes at
Large, 445.   Here the complainant agreed, on his own show-
ing, with the defendant *proposing to purchase the land*, to pay
him double the price at which he should bid off the land; these
are the very terms of the former act quoted; the written con-
tracts are, on the showing of the complainant, founded upon
that agreement, and therefore null and void.   And equity will
not enforce them.   1 Story's Eq., §§ 296 to 298; 2 Kent Com.,
466; Story's Conflict, §§ 245 to 247.   In these cases the com-
plainant is in this dilemma: Either the contract which he
seeks to enforce were *before* the land sale, and void under the
act of congress; or the contracts were *after* the land sale, and
there is no usury.

V. These contracts, on the showing of the complainant, were
good to the defendant for one-half of the principal sums, and
interest at 12 per cent. per annum.   And the complainant can-
not maintain the bill:

1. Because, on his own showing, the excess over 12 per
cent. on the actual money was alone usurious.   And whether
a court of law would or not allow the defendant to recover 12
per cent., yet a court of equity will not relieve the complain-
ant, unless he offers in his bills to pay all, deducting the
usurious interest.   1 Story's Eq., § 501; *Rogers v. Rathbun*, 1

Johns. Ch., 366. Now, here the offer and tender are to pay only 7 per cent. This is insufficient, and the bill would have been bad upon demurrer, and ought to have been dismissed on the hearing.

2. The lapse of time, and the disaffirmance by the defendant, had avoided these contracts before the bill was filed. *Benedict v. Lynch*, 1 Johns. Ch., 369; *Wells v. Smith*, 7 Paige, 22. Here the complainant asks the aid of a court of equity to resuscitate contracts, dead by their own terms and by law; and asks that, when resuscitated, so much of them as is against his own interest, may be held void, and so much as is for his interest, specifically performed. In other words, the bill seeks, first, the revival of a usurious contract; and second, relief against the usury. The pretense that this is a bill to redeem a mortgage is unfouned. A mortgage may exist in many forms of conveyancing; but there must always be a mortgagor and a mortgagee. And the title of the mortgagee must proceed by, from, or in some way in the right of, the mortgagor. Now the defendant's title comes from the United States, in the defendant's own right. And if there be here a mortgage, there is either a mortgage without a mortgagor, or a mortgagor by, from, or in whose right, the mortgagee did not take.

VI. If these contracts be held to be usurious, the court cannot grant the relief prayed for. The general rule of courts of equity is not to interfere between parties who are *in pari delicto*. Certain exceptions are made to this rule, not in favor of a guilty complainant, but in favor of public policy. And usury is one of these exceptions, in which courts of equity will relieve the debtor who agreed to pay usury, against his contract, in favor of public policy against usury. 1 Story's Eq., secs. 300, 301. But courts of equity will not enforce usurious any more than any other illegal contracts. In such cases, the rule *in pari delicto* applies; not the exception in favor of public policy. 1 Story's Eq., 296, a. Here the complainant seek° to avoid part, but seeks to enforce part by specific performance.

He has no right outside of the usurious instrument, and founds his right on it alone. The rule in equity is to refuse its aid to a party who founds his claim to relief upon and not against an illegal contract. *Bates v. Chester*, 5 Beavan, 103 ; 1 Story's Eq., sec. 296, a; Blydenburgh, 125. All the cases in equity which have been found involving usury, are cases where the complainants have sought relief against the usurious contract, whether executed or unexecuted, and not upon it. And here should be drawn a wide distinction between a debtor who is *in vinculis*, and agrees to pay usury because he cannot help it ; and a borrower who contracts an original debt at usurious interest, and afterwards seeks to have the money at a rate of interest at which he could not have borrowed it, by setting up usury. He cannot be supposed to be *in vinculis*. To him applies the maxim, *volenti non fit injuria*. To him it might be said in the words of Lord COKE, " The covin doth suffocate the right."

VII. *Pratt*, the complainant, claims as the assignee of Owen. His title as assignee, upon the proofs, is denied. But admitting his title, it is claimed that an assignee cannot set up usury. *Mechanics' Bank v. Edwards*, 1 Barb., 271 ; *Green v. Kemp*, 13 Mass., 515 ; *Bridge v. Hubbard*, 15 Mass., 96, 103 ; *De Wolf v. Johnson*, 10 Wheat., 367 ; *Stoney v. Am. Life Ins. Co.*, 11 Paige, 635 ; Blydenburgh on Usury, 106 ; *Flint v. Sheldon*, 13 Mass., 443 ; *Boardman v. Roe*, 13 Mass., 104 ; *Hale v. Jewell*, 7 Greenl., 435 ; *Denn v. Dodds*, 1 Johns. Ch., 158.

HUBBELL, C. J. The appellant claims as a purchaser, under Isaac C. Owen ; and admitting, for the purpose of the decision, that their rights are identical, it becomes necessary to inquire what was the original transaction between Owen and the appellee. In my judgment, the transaction must be resolved into one of three forms ; which may be stated as follows :

1. *Ayer* purchased the land in controversy, from the United States, absolutely and unconditionally for his own benefit, and

afterwards made a contract of sale, with Owen, as any other owner might or would do ; or,

2. *Ayer* loaned to Owen $400, to enter the land, and afterwards entered the land for him, and took and held the title as a security, by way of mortgage, for the repayment of the principal and a sum exceeding lawful interest, or,

3. *Ayer* acted as the agent of Owen, in advancing the money, entering the land and taking the title, and now holds the land in trust, to be conveyed to Owen on the terms and conditions mentioned in their written contract. Let us examine these positions in their order. Excluding the parol evidence, Owen undoubtedly appears a simple purchaser by contract; and inasmuch as the time limited for the payment of the entire purchase money has elapsed long before the filing of the bill, and as payment or legal tender of the amount due on the contract is not shown, his rights, upon this hypothesis, must be regarded as forfeited and lost ; and the decree of the circuit court, for that reason, must be affirmed. But a majority of the court do not take this view of the case, and I will not consume time by discussing the principles which lead to the suggested conclusion.

Can the transaction be resolved into a loan of money and a security for its payment ?

This position was strenuously and ably contended for by the appellant's counsel, who maintained not only that there was a mortgage to which the right of redemption attached, but a usurious loan, and that Owen, the mortgagor, was entitled to redeem on payment of the actual sum advanced (ten shillings per acre for the land), and interest at seven per cent. per annum. If the loan of money and security for its repayment were admitted, it cannot be denied that the alleged results would follow ; lapse of time and failure to comply with the terms of the contract would create no change in the relations of the parties. The rule, once a mortgage always a mortgage, would apply ; and the court would have no doubt of the right

of the mortgagor to redeem on payment (under the statute in force when the contract was made) of the principal sum loaned and legal interest. There would be a question of more difficulty, however: Whether a complainant, being a party to the usury, could invoke the aid of equity, first to discover the fact of an illegal contract and then to affirm it in part, and disaffirm it in part, for. his benefit? It will be time enough to decide a question of so much nicety when its settlement becomes imperative.

The usurious agreement for a loan is by no means clearly established. The evidence shows that Owen made application for a loan of money to enter his land, to which *Ayer* replied in substance, that he was willing to enter it in his own way; and then states the terms, which were the same finally agreed upon and carried out by the parties. He made no agreement, except to enter the land "for Owen," in his "own way." This indeed presents a case, where senses, keen on the scent of usury, might track out a "contrivance to evade the statute," but even if we could venture to assume (for it must be assumption at least) that there was an "agreement for a loan," there is yet more difficulty in finding that there was a security executed by the borrower to the lender in the nature of a mortgage.

A mortgage is a contract of sale executed with power to redeem. Powell on Mortgages, ch. 2, p. 24. The particular form of the transaction is not material, provided there is a conveyance executed, or procured to be executed, by the borrower to the lender, to secure the payment of the money. "To constitute a valid mortgage," says the same learned author, "there must be a mortgagor, who must be a person capable of granting, conveying or assigning the land or thing mortgaged; a mortgagee, who must be capable of a grant, conveyance or assignment to him; and a thing mortgaged, which must be granted or assigned in that order or manner which the law requires." Id., ch. 3, p. 77. Now if we assume upon the evidence that *Ayer* agreed to advance money and purchase the

land in question of the United States; to take and hold the title, and to give Owen a contract of sale, of the form and tenor of that shown to the court; and that Owen, on his part, agreed to buy the land of *Ayer*, at the price and upon the terms and conditions of the written contract; or (perhaps I should say), agreed to enter into such a contract as the conclusion of the arrangement; and that this agreement was literally and fully performed by the parties, up to and including the execution of the contract; still there seems to me one essential requisite of a mortgage wanting. Owen, the assumed mortgagor, did not convey, nor procure to be conveyed to *Ayer*, the assumed mortgagee, any right or interest whatever in the land. When their negotiations took place, the title of the land was in the United States. Though Owen had possession in fact, he was not in any just sense, a person capable of granting, conveying or assigning the thing mortgaged. And what is more, he did not undertake or agree to do it. He agreed to let *Ayer* enter the land for him; and *Ayer* so entered it, and paid for it. If he paid for it with the money of Owen, there was a *resulting trust* to Owen; but if with his own money, then he was an absolute purchaser, unless for a proper consideration he had agreed to enter it in trust. At all events, *Ayer* procured the title to be transferred from the United States to himself, and unless he was his own mortgagor, I profess myself unable to comprehend how he became, in any proper sense, a mortgagee; and much less can I comprehend how Owen became entitled to an equity of redemption in that which he never owned and never transferred or procured to be transferred.

This case differs essentially from that of *Rogan v. Walker*, 2 Pin., 463; but the court there carefully avoid saying there was a mortgage or a security of that nature. Walker, who entered the land in pursuance of a previous agreement, afterwards actually conveyed it to Rogan; and it was claimed that the deed was conditional and had been absolutely forfeited.

The court held that the whole was one transaction, and that Rogan held the whole title to the land, subject to the lien of Walker for some sum which it did not undertake to determine. This sum might be unpaid purchase money, or money advanced to enter the land upon a trust arrangement. As the case is yet before the supreme court, I will not comment on points designedly left undetermined. I proceed to the last position.

Did *Ayer* act as the agent of Owen in advancing the money and effecting the purchase? and does he hold the land, under their agreement, in trust? It is said a trust cannot be established by *parol.* This is undoubtedly true. *Steere v. Steere,* 5 Johns. Ch., 1; *Letcher v. Letcher's Heirs,* 4 J. J. Marsh., 593. And here, I conceive, lies the chief difficulty in the view taken by the majority of the court in this case. But the existence of a trust need not be declared in express terms. It may be proved by any proper written evidence, by an answer, or by a note, letter, or memorandum in writing, disclosing facts which create a fiduciary relation. *McCubbin v. Cromwell,* 7 Gill & J., 157; *Forster v. Hale,* 3 Ves., 696; *Jackson v. Moore,* 6 Cowen, 706; *Steere v. Steere, supra.* The written contract executed between *Ayer* and Owen disclosed the essential particulars of the present trust sufficiently to take the case out of the statute of frauds. The parol proof was properly admitted to show the circumstances out of which the contract grew. They all tend to the affirmance of the contract. If there had been no written contract, the circumstances alone, however strong, could not be shown to establish the trust relation. And hence it is true, that had *Ayer,* after entering the land, refused to execute the contract, though the relations of the parties would have been the same, Owen might have been deprived of a remedy by the statute of frauds. But the agreement was fulfilled — the written contract executed; and it is no new doctrine that courts of chancery will look into the circumstances to see why a deed, bond, contract or other written instrument was executed. Such

a writing was precisely what was wanted in *Steere v. Steere*, *supra ;* and the learned chancellor of New York, while denying the sufficiency of the lame efforts to make out written evidence of the fiduciary undertaking of the defendant in that case, distinctly asserts the principle here acted upon. It is to be observed that the sworn answer of *Ayer* denies the trust purpose for which the land was entered; but the evidence was quite too overwhelming to leave any question as to the anterior agreement made between him and Owen. It was contended, however, in argument, that this agreement, if made, was without consideration and mutuality. We have thought otherwise. When the verbal arrangement was made, Owen was in possession of the land, having made valuable improvements, with the *bona fide* intention of purchasing whenever the lands were put in market. His possession was of value, in the estimation of the settlers; and it was in a fair way to be protected, as we have seen, by the unauthorized but efficient regulations adopted by the community. Sales and transfers of such, possessing rights or "claims," were frequently made, and for large sums actually paid. They were, then, worth money, because they would bring it; and it is too late in the day to say that the occupant was a mere trespasser when taking possession of and improving public lands, with a view to effecting a purchase of the title at government prices. Such alleged trespassers have peopled and fertilized the great west, until the wilderness was made to bud and blossom as the rose, ere the tardy movements of the government provided a means of securing a title by the hardy pioneer.

But congress has recognized the rights of the settler, by passing frequent preëmption laws for his benefit; and it is only in the abstract and upon principles more nice than wise, that the courts can hold occupancy and actual cultivation of the public lands as a trespass; or the transfer of such a possession as without consideration.

Were it material in this case, it would be difficult to say that

a voluntary surrender of such possession and waiver of such claim of right of entry, in favor of a purchaser, was not a sufficient consideration to support a promise. But the agreement made between the present parties rests upon no such questionable grounds. As the case comes before us, it is an executory agreement. The condition on which *Ayer* made the entry was, that Owen should enter into the contract produced in evidence. This was done. The execution of the contract by Owen was a fulfillment of their verbal agreement, and is a consideration which *Ayer* cannot deny. He has had, and perhaps still has, a legal right to sue upon this contract and collect twice the sum actually advanced, and the interest. This is a consideration not only good but sufficient. Again, Owen was equally entitled, by paying the money, to fulfill the contract, and get a conveyance of the land. This is mutuality. But another point was raised, which commands notice. It was contended that Owen's prior agreement to purchase the land, if made, was in violation of the act of congress of March 31, 1830, and that the written contract growing out of it was void. We think the act does not apply. It prohibited any agreement with " any person or persons proposing to purchase," etc., " to pay or give such purchaser a sum of money, over and above the price at which the land may be bid off," etc. Here Owen was the person " proposing to purchase." He was in possession and desirous to obtain title. But for the agreement by which *Ayer* undertook to enter the land for him, certainly *Ayer* would have had no idea of purchasing. *Ayer* was only the nominal, Owen the real purchaser and owner of the land. In other words, *Ayer* was a mere trustee, taking and holding the title for the use and benefit of the *cestui que trust,* subject to the payment of the sum stipulated beforehand.

This is the view which a majority of the court, after a very careful consideration, have taken of this transaction. Against it, the appellant's counsel have strongly urged, 1. That the alleged commission of the trustee is unreasonable, extortionate

and without precedent; and 2. That the whole transaction was a mere contrivance to evade the interest law of the territory; and that equity, throwing off the disguise and looking at the intention of the parties, must hold the agreement void for usury.

It is not a little singular that a contract of this character is now, for the first time, brought before the supreme court of Wisconsin. It would relieve the case of some embarrassment, if contemporaneous courts had passed upon the transaction, at the time of its occurrence. Principles of equity, always flexible, and to be applied according to the actual state and condition of communities and their established business relations, might not have seemed strained by being made to conform to the then actual condition of things.

The history of the times shows that the present transaction was but one of thousands, which spring from necessity, out of the circumstances of the early settlers, and the condition and price of the public lands. Money was scarce, land was cheap. Settlers and capitalists made such arrangements as suited their respective circumstances and interests; and the result was unquestionably, a mere division of profits. That these agreements were entered into fairly and voluntarily, is evinced by the fact that they have been so uniformly held inviolable. The peculiar circumstances which induces them, probably never existed in the older states of the Union, or in England, and hence the absence of like cases in their courts. Shall we now impeach the validity of a contract, mutually advantageous and voluntarily entered into, simply because other courts, adjudicating under widely different circumstances, might have held it unreasonable, and therefore void? Shall we say that the amount of the commission in this case is evidence of a design to cover usury, when we can see clearly, and the parties themselves believed, that the amount agreed upon was an equitable division of profits, in proportion to their respective undertakings and risks?"

It is a poor rule that arbitrarily applies precedent when the reason that induced it has passed away. It is a good and sensible rule, that courts, when they can discover a proper motive for any business transaction, should not conjecture designs which will render it illegal. This most reasonable doctrine has not wanted support, even in the courts to which we are invited to look for precedents. 4 Brown's Ch., 28; 19 Johns., 496; 9 Peters, 378; 4 Comst., 225.

Those who operated in the purchase of lands at an early day may have avoided or evaded the usury law of the territory. But was that the prominent design of the parties? Was it the controlling purpose of the present arrangement? It seems to me gratuitous and unjust to draw such a conclusion when other and abundantly good reasons existed for the very arrangement that was made. The trust character which we attach to the transaction not only secures actual justice, but it seems to me the only construction which will carry out the actual intention of the parties themselves. *Ayer* undertook to act in a fiduciary capacity; and it would be an unwelcome necessity which would force us to give his contract a different construction, and allow other parties to take the benefit of its fulfillment on paying one-half only of the stipulated sum and interest. Not less unjust would it be to allow him to disclaim the trust and hold the land absolutely, on forfeiture of the contract.

There is no sufficient ground, either in reason or authority, for disturbing the decree of the circuit court; and it must be affirmed with costs.