Lucy V. S. Ames, Plaintiff, Appellant, *v.* William H. Scudder et al., Defendants, Appellants.

November 22, 1881.

1. Where trustees under a will are empowered "to pay and discharge the several legacies * * * in money or in real or personal property, or both, in such manner and at such valuations" as shall seem to them "fair and just," an entry upon the books of the firm of which one of the trustees is a member, crediting the legatee with a sum in cash equal to the assumed value of certain lands, is insufficient to pass title to the land to such legatee.

2. Under such a will, in order to vest title to particular land in a legatee or to create a special trust in the trustees for such legatee in such lands as they may assign him in payment of his legacy the divestiture, or the trust, must be declared by some memorandum in writing which will satisfy the statute of frauds.

3. A court of equity in adjusting property rights must treat the titles as it finds them, whether properly set forth in the pleadings or not.

4. Compound interest will not be charged against negligent trustees, where the facts do not indicate a withdrawal of the funds from their legitimate channels of accumulation, or a realization by the trustees of profits on the assets, and do not raise a presumption that the assets would have been increased by a more strict adherence by the trustees to their line of duty.

5. Commissions on cash disbursements duly approved, will not be denied trustees, where there is no such mismanagement as to cover up or diminish the fund, and no appropriation of it, or its proceeds, by the trustees, to their own use.

6. Where a will empowers the trustees thereunder to set apart stocks to a legatee in lieu of other property, a designation or setting apart of such stocks by the trustees to such legatee vests the title thereto in him.

7. Where the will places certain acts within the discretion of the trustees, who have exercised that discretion and have consummated its purpose, courts of equity will not set it aside and substitute their own discretion.

8. Where the value of property set apart to a legatee is not fixed in accordance with the will, such valuation may be corrected by a court of equity.

9. Where an allotment has been made, the legatee will be treated as the owner of the property thus allotted from that date until the sale by an order of the court.

APPEAL from the St. Louis Circuit Court, THAYER, J. *Affirmed.*

HITCHCOCK, LUBKE & PLAYER, for the plaintiff: " The execution of a power must be according to the substantial intention and purpose of the party creating the power ; not restraining or lessening it by a narrow or rigid construction, nor by a loose and extended interpretation dispensing with the substantial object which was meant to be performed." — *Jackson* v. *Veeder*, 11 Johns. 169 ; *Aleyn* v. *Belchier*, 1 Ld. Cas. Eq. 573, and notes ; 2 Perry on Tr., sects. 508–511, 511a, and cases cited ; *Trustees, etc.,* v. *Northampton*, 10 Allen, 498 ; 1 Story's Eq. Jur., sect. 106 ; *Wormley* v. *Wormley*, 8 Wheat. 442 ; *Cloud* v. *Martin*, 1 Dev. & B. 397 ; *Cocke* v. *Minor*, 25 Gratt. 246 ; *Yosti* v. *Loughran*, 49 Mo. 599. The best attention must be personally given by the trustee to the objects of the trust. — *Brickenkamp* v. *Rees*, 69 Mo. 426 ; *Stoffel* v. *Schroeder*, 62 Mo. 149 ; *Bales* v. *Perry*, 51 Mo. 452 ; *Haydel* v. *Hurck*, 5 Mo.

App. 274.   Being joint trustees, both qualified and acting, neither one alone could exercise any discretionary power conferred upon both ; and any alleged exercise of such discretion by one, without the actual concurrence and judgment of the other, would be void. — 2 Washb. on Real Prop. (4th ed.) 660, 661 [*322] ; *Graham* v. *King*, 50 Mo. 22 ; *Bales* v. *Perry*, 51 Mo. 451 ; 1 Perry on Tr., sect. 408 ; 2 Perry on Tr., sects. 509, 779, and cases cited ; *Franklin* v. *Osgood*, 14 Johns. 553 ; *Berger* v. *Duff*, 4 Johns. Ch. 369 (per Kent, Ch.), and cases cited.   The valuation of the lands " set apart " was not a just valuation and was not arrived at by a proper exercise of the discretion of the trustees ; and as to the question of fraudulent interest in " setting apart " the lands at such valuation, it is not necessary that fraud should appear by direct or positive proof, but that it may be established by inference from all the circumstances. — *The State* v. *Estel*, 6 Mo. App. 10 ; *Hopkins* v. *Siebert*, 58 Mo. 201 ; *Burgert* v. *Borchert*, 59 Mo. 83.   Trustees cannot invest trust-moneys in personal securities, and " in the absence of express authority, the employment of trust-funds in trade or speculation, or in a manufacturing establishment, will be a gross breach of trust."— 1 Perry on Tr., sects. 453, 454 ; *In re Davis*, 62 Mo. 453 ; *Williams* v. *Petticrew*, 62 Mo. 460, 472.   As already shown, the intent of the testator was that said legacies should all be paid as soon as possible, consistently with realizing the utmost value of the estate, but the postponement of the payment was in no case to exceed five years. During that period the trustee was not " obliged " to pay any legacy ; but after that the permission of delay expired by limitation.   Moreover, since the discretionary powers of management, sale, investment and payment of the legacies in property instead of money, were each and all of them simply means towards the end designed, of making the most of the estate for the payment of said legacies in not more than five years from the testator's death, it follows

that these powers also expired at the end of five years, and the court itself could not thereafter resuscitate the powers so expired and dead. — *Jackson* v. *Jansen*, 6 Johns. 73, 81; *Sharpsteen* v. *Tillou*, 3 Cow. 651; *Devaynes* v. *Robinson*, 24 Beav. 86, 94; 4 Kent's Comm. 331, and cases cited. Assuming these views as correct, the familiar doctrine is at once applicable, that equity treats that as done which ought to have been done. — 1 Story's Eq. Jur., sect. 64q; *Craig* v. *Leslie*, 3 Wheat. 577; *De Peyster* v. *Clendining*, 8 Paige Ch. 305; *Fletcher* v. *Ashburner*, 1 Bro. C. C. 479; *Kirkman* v. *Miles*, 13 Ves. 337; *Huxton* v. *Corse*, 2 Barb. Ch. 506; *Smith* v. *Kearney*, 2 Barb. Ch. 533. And even though the time of sale is discretionary with executors or trustees under a power, yet where there is a power to sell, and a sale is necessary to effect the intent of the testator, it is held that an immediate conversion in equity takes place, and the discretion as to the time of sale has no effect upon the question. — 1 Ld. Cas. Eq. 1164, 1166, and cases cited; *Martin* v. *Sherman*, 2 Sandf. 341, 343; *Stagg* v. *Jackson*, 1 Comst. 206, 212. It has been repeatedly held that, if, after a breach of trust, the estate depreciates in the trustee's hands, he must make good the loss individually. — 2 Story's Eq. Jur. sect. 1061a; *Devaynes* v. *Robinson*, 24 Beav. 86, 94; *Newhall* v. *Wheeler*, 7 Mass. 189; *Hovey* v. *Glover*, 2 Hill Ch. 515; *Voorhees* v. *Melick*, 25 N. J. Eq. 523; *Cocke* v. *Minor*, 25 Gratt. 246. And while courts of equity do not ordinarily give damages, such relief is constantly granted by way of compensation and to avoid circuity of action, both under the old chancery practice and under the Code. — 2 Story's Eq., sect. 749c; 794, 799; *Holland* v. *Anderson*, 38 Mo. 55; *Ames* v. *Gilmore*, 59 Mo. 537, 541. "Where a trustee uses funds in his own business, or appropriates them, rendering no account, he is liable for undisclosed profits. A mere omission to invest is distinguished from a case where the trustee has had

the use of money." — *In re Camp*, 6 Mo. App. 564 (citing *Williams* v. *Petticrew*, 62 Mo. 472 ; *Barney* v. *Saunders*, 16 How. 542 ; *Hook* v. *Payne*, 14 Wall. 252 ; 1 Am. Ld. Cas. *523, *535 ; *Moore* v. *Beauchamp*, 5 Dana, 77 ; *Comegys* v. *The State*, 10 Gill & J. 186 ). Not only is this a sound rule, but the true reason thus given for it is laid down in the following cases, to each of which the appellant respectfully asks the particular attention of this court, if any doubt should arise as to abandoning the line of decisions already established in this state. — *Rowen* v. *Kirkpatrick*, 14 Ill. 11 ; *Schieffelin* v. *Stewart*, 1 Johns. Ch. 620 ; *Jansen* v. *Hapgood*, 10 Pick. 78 ; *Evartson* v. *Tappen*, 5 Johns. Ch. 517 ; *Fay* v. *How*, 1 Pick. 528 (see cases in note) ; *Garrett* v. *Carr*, 1 Rob. (Va.) 213, 214 ; *Voorhees* v. *Strothoff*, 6 Halst. 145, 151, 162 ; *Dunscomb* v. *Dunscomb*, 1 Johns. Ch. 508 ; *Torbet* v. *McReynolds*, 4 Humph. 215 ; *Paul* v. *Simmons*, 6 Geo. 271, 272 ; *Clemens* v. *Caldwell*, 7 B. Mon. 171, 176 ; *Wright* v. *Wright*, 2 McCord, 203 ; *Lyon* v. *Magagnos*, 7 Gratt. 377.

J. M. & C. H. KRUM and BROADHEAD, SLAYBACK & HAEUSSLER, for the defendants : The record shows no ground for interference with the allotment of stocks by the trustees. The will granted to them an unrestricted discretion. No fraud on the part of the trustees having been shown, their valuation of property cannot be interfered with by the courts. — *Hawley* v. *James*, 5 Paige, 485 ; *Cowles* v. *Brown*, 4 Call, 477 ; *Fonty* v. *Fonty*, 1 Bailey Eq. 518, 529 ; *Arnold* v. *Gilbert*, 3 Sandf. Ch. 556 ; *Mason* v. *Mason*, 4 Sandf. Ch. 623 ; *Banner* v. *Storm*, 1 Sandf. Ch. 357 ; *Hawes Place Society* v. *Trustees*, 5 Cush. 457 ; *Williams's Appeal*, 23 J. P. Smith, 249 ; *Graeff* v. *De Turk*, 8 Wright, 527 ; *Smith* v. *Wildman*, 37 Conn. 384 ; *Beloved Wilkes's Charity*, 7 Eng. L. & Eq. 75 ; *Mason* v. *Jones*, 3 Edw. Ch. 498 ; *Cooper* v. *Williams*, 4 Ohio, 286 ; *Walker* v. *Walker*, 5 Madd. 424 ; *Morton* v. *Southgate*, 28 Me. 21 ; *Chew's Executor* v. *Chew*, 28 Pa. St. 17 ; *French*

v. *Davidson*, 3 Madd. 396 ; *Lee* v. *Young*, 2 You. & C.
Ch. Cas., chap: 532 ; *Haydel* v. *Hurck*, 72 Mo. 253. The
trustees executed the power for the end designed. The
trustees acted in good faith in setting apart the property to
Henry Ames, Jr. — *Noonan* v. *Lee*, 2 Black, 508 ; *Moore*
v. *Greene*, 19 How. 69 ; *Voorhees* v. *Boursteel*, 16 Wall.
29. The point made upon the will, as having imposed a
limitation of time upon the exercise of the discretion vested in
the trustee, is without merit. To sustain it, the court will
have to remodel the will to meet a contingency not in the
mind of the testator. This is never done. — *Lepage* v. *Mc-
Namara*, 5 Clarke Ch. 124 ; *Stokes* v. *Tilly*, 1 Stockt.
130. The rule of construction is to give effect to the
special as well as the general intention of the testator.
But the general intention controls. — *Norris* v. *Bayea*,
13 N. Y. 273, 283 ; *Parks* v. *Parks*, 9 Paige, 120 ; 1
Redf. on Wills, 433, 434 ; *Rose* v. *McHose*, 26 Mo. 590.
The court below erred in setting aside the allotment of
stocks. Its action ought to have been limited to the excess
in value over the balance due on the legacy to Henry Ames,
Jr., after the real estate had been set apart. The trustee
acted in good faith. The excess is readily distinguish-
able. Henry Ames, Jr., took his legacy by virtue of
the provisions of the will. — *Collier's Will*, 40 Mo. 287 ;
*Brown* v. *Brown*, 44 N. H. 281 ; *Doe* v. *Consandine*, 6
Wall. 458 ; *Kimball* v. *Crocker*, 53 Me. 263 ; *Manice* v.
*Manice*, 43 N. Y. 303 ; *Barton* v. *Bigelow*, 4 Gray, 353.
The excess being separable, the court will let the ap-
pointment stand as far as it is consistent with the terms of
the power. — *Tollett* v. *Tollett*, 1 Ld. Cas. Eq. Pl. 1361 ;
*Palmer* v. *Wheatie*, 2 Ball & B. 28 ; *Commissioners* v.
*Nichols*, 14 Ohio St. 272 ; *Warren* v. *Hovill*, 3 Wash. C.
Ct. 12 ; *Hervey* v. *Hervey*, 1 Atk. 568 ; *Smith* v. *Lord
Camelford*, 2 Ves. Jr. 71 ; 2 Sudgen on Pow. 75 ; *High*
v. *Worley*, 32 Ala. 709 ; *Congdan* v. *Cahon*, 48 Vt. 49 ;
*Judd* v. *Bushnell*, 7 Conn. 205 ; *Cabelle* v. *Puryear*, 27

Gratt. 908 ; *Crane* v. *Prather*, 4 J. J. Marsh. 75 ; *Avery* v. *Bowman*, 40 N. H. 458. The referee laid down the true rule of interest as against the trustees. — *Gamble* v. *Gibson*, 59 Mo. 596 ; *Garniss* v. *Gardner*, 1 Edw. Ch. 128 ; 1 Perry on Tr. 570, sect. 468 ; *King* v. *Talbot*, 40 N. Y. 95. The trustees are entitled to allowance in their behalf of attorneys' fees and expenses. — *Fitzgerald* v. *Pringlee*, 2 Mol. 534 ; *Colton* v. *Clark*, 16 Beav. 134 ; *Sanderson* v. *Walker*, 13 Ves. 601 ; *Knott* v. *Cottee*, 16 Beav. 77 ; *Payne* v. *Little*, 27 Beav. 83 ; *Downing* v. *Marshall*, 37 N. Y. 380 ; *Capehart* v. *Huey's Administrator*, 1 Hill Ch. 411 ; *Attorney-General* v. *Mayor*, 2 Myl. & Cr. 424 ; *Walters* v. *Woodbridge*, 7. L. R. (Ch. Div.) 504 ; *Morton* v. *Barrett*, 22 Me. 257 ; *Taylor* v. *Tabrum*, 6 Sim. 281 ; *Baker* v. *Carter*, 1 You. & C. 254.

Lewis, P. J., delivered the opinion of the court.

Henry Ames died in August, 1866, leaving a last will and testament, whose provisions material to this controversy, are as follows : After a devise of specific property to the widow, Catherine Ames, in lieu of dower, the entire remainder of the estate is bequeathed to the testator's brother, Edgar Ames, in trust, for the following, among other, purposes : 1. To pay to Miles Sells, in trust for his son, Henry Ames Sells, $5,000. 2. To hold in trust for Henry Semple Ames, son of Edgar Ames, $20,000, which sum is to be invested in real estate or other permanent security until the beneficiary shall have arrived at the age of twenty-one years, when the property, with its increase, is to be transferred to him in full property. 3. To hold for the benefit of the testator's son, Henry Ames, the sum of $200,000. The same beneficiary is made residuary legatee. It is provided that all the property thus appropriated to the benefit of Henry Ames, Jr., is to be held in trust and managed by the said Edgar Ames for the use of the beneficiary until he shall have arrived at the age of twenty-

one years, when " said trust estate, with its accumulations, shall be transferred and conveyed to him in absolute property; the said trustee, during minority of my son, setting apart such portion of the income thereof as may be necessary for the support and education of my said son." 4. " To retain for the exclusive use and benefit of himself, my said brother, Edgar Ames, the sum of $100,000." 5. To pay to the Washington University, for the use of the O'Fallon Polytechnic Institute, the sum of $100,000. 6. To pay to John Bliss the sum of $400 per annum during his natural life, and to his wife, surviving him, the sum of $200 per annum. 7. To pay to colored servant Judy, $100. 8. To pay to John A. Scudder and to William H. Scudder each the sum of $5,000. The will further provides that if, from any cause, the estate shall prove insufficient to pay all the legacies in full, then appropriations of the trust-fund are to be made in the following order: 1. To supply certain possible deficiencies which may arise in the property devised to the testator's wife. 2. To the payment of just debts and funeral expenses. 3. To the payment of the legacy and annuities to Judy and to John Bliss and wife. 4. " To set apart and appropriate to the use of my said son, Henry Ames, the said sum of $200,000." " Lastly, to pay the remainder *pro rata*, in proportion to the amount bequeathed each, or for the use of each, upon the other legacies, devises, and bequests herein mentioned." Edgar Ames is appointed executor of the will, and full power is given him, " both in his capacity as executor and also in his capacity as trustee, * * * to sell, transfer, and convey, by deed of general warranty or otherwise, any of my real or personal estate, or any interest therein, from time to time, as he may see fit; to invest the proceeds thereof and change the investment at pleasure, and generally to manage the estate and property belonging to my estate as if they were his own, for the benefit of said trust; * * * to pay and discharge the several legacies and bequests herein pro-

vided to be, paid out of said trust-fund, in money, or in real or personal property, or both, in such manner and at such valuations as shall appear to him fair and just. And in order that the estate so devised and bequeathed to him as trustee may be managed in the most efficient way to pay, without detriment or sacrifice, the said several bequests and legacies, and that sufficient time be given to make the assets most productive, I hereby direct that, with the exception of annuities to said John Bliss and to his wife, and said sum to said Judy, that though said trustee is at liberty to pay said several legacies and bequests, or any of them, when he sees fit, yet he shall not be obliged to pay any of said legacies until after the expiration of five years from the time of my death; and such payment when made, shall be without interest on such bequests.'' The testator further declares: '' In case of the death, disability, or refusal of my brother, Edgar Ames, to act as my executor, then I hereby appoint John A. Scudder and William H. Scudder, or the survivor of them, to be the executors of this will; and in case that my said brother shall not be able to, or shall decline to accept said trust as trustee, then I appoint said John A. Scudder and William H. Scudder, and the survivor of them, as trustee hereunder, in place of my said brother, with the like powers as conferred on him, my said brother, by this will.''

Edgar Ames qualified as executor of his brother's will, and died in December, 1867, without having paid any of the bequests. The defendants, John A. and William H. Scudder, were soon after qualified as executors and trustees, in accordance with the directions of the testator. The widow of Henry Ames renounced the provisions of the will, and elected to take a child's part, which, in this case, amounted to one-half of the estate. The plaintiff in this cause became administratrix of the estate of Edgar Ames, deceased.

When this suit was commenced, in September, 1872, the

defendant executors and trustees had paid the several bequests having priority over that in favor of Henry Ames, Jr., and had set apart for the benefit of the latter, certain stocks and real estate at an aggregate valuation of $199,- 993.25.   Nothing had been paid on account of the remaining bequests.   No debts of the estate remained unpaid.

The amended petition charges, in effect, that the lands set apart by the trustees to Henry Ames, Jr., at a valuation of $140,798.25, were, in fact, worth at least $240,000 ; that eleven hundred and eight shares of stock so set apart at a valuation of $40 per share, amounting to $44,320, were, in fact, worth $60 per share, or $66,480 in all; that two hundred and twenty shares of other stocks, set apart in like manner, were worth largely more than the valuations put upon them in such setting apart; that, while it is alleged by the trustees that the assets remaining in their hands are insufficient to pay off the unsettled bequests, yet this is untrue, and the trustees still hold assets of the value of $450,000 — more than enough to pay off all the bequests not yet discharged.   It is charged that the trustees, in violation of their trust and duty under the will, have wholly failed and refused to fairly or justly value the property, and "have undertaken to set apart to said Henry Ames a much larger amount in value of said trust estate than he was or is entitled to receive, well knowing such to be the fact; that the defendant trustees have refused, although requested, to pay to plaintiff as administratrix of the estate of Edgar Ames, deceased, the said legacy of $100,000, or any part thereof.   Plaintiff prays for a decree directing an account to be taken of the trust estate and of its nature and value, that a fair and just valuation of the same be made under the orders of the court, and that the trustees be ordered to set apart, transfer, convey, and deliver to plaintiff, or to the legal representatives of Edgar Ames, deceased, the amount of said legacy, with interest thereon, and for other proper relief."

The trustees' answer denies that they have in their possession assets sufficient to pay the bequests in full, or to pay in full the legacy to the plaintiff's intestate; admits the setting apart of lands and stocks, as alleged, to Henry Ames, Jr., but avers that the respective valuations of the same were fair and just; denies specifically all the valuations alleged in the petition; denies that the trustees have in any manner violated their trust, or that they have set apart to Henry Ames, Jr., more than he was entitled to, well knowing the fact. The trustees declare their willingness that an account of the trust estate shall be taken, and that such orders shall be made by the court as the amount of property in their hands and the provisions of the will will justify. They state, however, that, by reason of litigation pending in respect of a part of the assets, the affairs of the estate are not now in proper condition for a full settlement.

In July, 1873, the cause was sent to three referees, who held their sittings from time to time until June, 1874, taking testimony and pursuing the special inquiries committed to them by the court. In January, 1875, they filed their report. From this it appeared that the testator's property subject to the payment of his bequests consisted of the following, to wit: 1. Eleven parcels of land in the city of St. Louis, on some of which were valuable improvements. 2. About six thousand three hundred and eighty-two acres of unimproved lands in the counties of Barton, Audrain, Washington, Franklin, and Barry, in the State of Missouri. 3. Certain lots in the city of Chicago, and about one thousand three hundred and sixty acres of land in St. Clair, Randolph, and Edgar Counties, Illinois. 4. Lands in Iowa which were sold, pending the reference, for $998.05. 5. About one thousand three hundred and twenty-eight shares of stock in sundry business corporations. 6. About $90,316.16 in cash, subject to the payment of certain costs and expenses not estimated. 7. Some house-

hold furniture, value not ascertained. The referees found that the total value of all the property subject to payment of the legacies was, in August, 1871, or five years after the death of the testator, $402,844.59, and in July, 1873, the date of the reference, $423,541.02. They found that the lands which were set apart to Henry Ames, Jr., in February, 1871, at a valuation of $140,798.25, were worth in August, 1871, being six months later, without any rise or fall in the interim, $201,374.50; and in July, 1873, $228,-057.16; also, that the stocks which were set apart to the same beneficiary in July, 1872, at a valuation of $59,195, were fairly worth, when so set apart, $90,672.50. They conclude, that all the property set apart to Henry Ames, Jr., at a gross valuation of $199,993.25, was reasonably and fairly worth when so set apart, $292,047.

Exceptions to the referees' report, filed by the defendants, were sustained as to the amount of money reported to be in the trustees' hands, and were overruled as to all other matters. In an interlocutory decree the court approved and confirmed the action of the trustees in setting apart the lands to Henry Ames, Jr., but disapproved and annulled their setting apart of the stocks. The stocks were afterwards sold under orders of the court. In the final decree the court adhered to its approval of the setting apart of the lands at the trustees' valuation.

This setting apart of real estate for the benefit of the testator's son was an attempt to execute that provision of the will which empowered the trustees "to pay and discharge the several legacies and bequests * * * in money, or in real or personal property, or both, in such manner and at such valuations" as should appear to them "fair and just." The evidence shows that no declaration of trust, or other conveyance of any sort, was executed by the trustees to consummate the intended disposition of the property. The only memorial of the transaction consisted of entries made on the books of a mercantile firm in which one of the

trustees was a partner. The trustees simply resolved be-tween themselves to treat certain lots, thenceforth, as be-longing to Henry Ames, Jr., and thereupon, fixing certain valuations upon them, they caused him to be credited on the books of the firm with the amount of the valuations as so much money. Afterwards, when the trustees collected rents from the same property, the amounts were entered on the same books, to the credit of Henry Ames, Jr.

From the earliest dawning of common-law rule to the present day, there has prevailed a fundamental exaction, that every transfer of ownership in land shall be marked by some token of publicity, or of notoriety, that will leave open no avenue for a doubt of the historical fact. Without livery of seisin, no array of formalities was competent to pass the freehold. In cases of title by descent, the death of the ancestor and the kinship of the heir were in them-selves facts of notoriety sufficient to satisfy the common-law demand. But a conveyance by bargain and sale oper-ated no transmission of title, even though the deed was delivered and the purchase-money paid. Hence it was considered that the still entitled bargainer held the land to the use of the bargainee, who could thus enjoy the fruits of his investment. The Statute of Uses (27 Hen. VIII., c. 10) made this use the equivalent of a legal title in the bar-gainee. But it was soon perceived that this involved a departure from ancient principles, and so, six years later, the statute of 27 Henry VIII., c. 16, was adopted, provid-ing for an added notoriety to such transfers in their neces-sary enrollment within six months, before the *custos rotu-lorum* and other officers. When no pecuniary consideration was paid, and the conveyance was for the consideration of blood or marriage, the transaction became a " covenant to stand seised to uses ; " and no enrollment was required, be-cause of the notoriety of the relations existing between the parties. These reminiscences may seem digressive, but they strongly illustrate the repugnancy which was always identi-

fied with an attempt to alienate land by a mere private convention between the parties. Modern laws are not less exacting. Our statutes require that conveyances of real estate shall be made in writing, and even then, they will not be valid except as between the parties, and as to those having actual notice, until acknowledged and recorded according to prescribed forms.

The method adopted by the trustees for setting apart lands to Henry Ames, Jr., was rather less deferential to ancient usage than would be a parol agreement between a grantor and grantee. The beneficiary was a minor, and, though he might receive a benefit, he was incapable of contracting. It does not even appear that he was cognizant of the act of the trustees. Their entries upon the books of a mercantile firm were no more than private memoranda. If they expressed anything, it was only the secret purposes or wishes of the trustees, which they might just as well have kept locked up in their own breasts. Nothing could prevent their changing or annulling them *in toto* whenever they might think proper. Surely this was no execution of a power to " pay and discharge " a bequest in real property.

The trustees were to " hold for the benefit of Henry Ames, Jr., money or property, or both, as they might elect, to the amount or value of $200,000, until he should become of age." But this money or property was to be first carved out by them from the entire estate which was vested in them for this and other trusts besides. Is it possible to imagine that the testator expected this to be done otherwise than by an act which the law would recognize as effectual for a transmutation of the ownership? Up to the time of such carving out, Miles Sells, Washington University, and other beneficiaries of the trust, have a like interest in the same property, to the extent of their several and respective bequests. The setting apart or carving out, for the special benefit of one legatee, must necessarily be effectual to exclude all interest of the others in the money or

property so set apart. This, in the case of land, is equivalent to a divesting out of the other beneficiaries an interest in the property hitherto held by them. When an equitable interest, however attenuated, in real estate, is to be divested out of the holder, our laws require something different from an entry on mercantile books.

If A devise to B a certain lot of land to be held in trust for the benefit of C, there need be no difficulty about ascertaining the respective rights and titles of the parties from the moment of B's acceptance of the trust. The will, with its probate, is the authentic and public act which proclaims those rights and titles to all the world. Nothing more is required to be done in order that all may know how stands the ownership of that lot. But, in the will before us, something more was left to be done, before it could be known that any lot or lots, of all belonging to the estate, had become the property, legal or equitable, of a particular legatee. The title to be held by the legatee will be derived from the will. But until some act is done by the trustees, which shall place in him an exclusive title to a specific lot or lots, he will hold in such lot or lots a mere undivided and contingent interest in common with all the other legatees ; an interest, moreover, which may be wholly extinguished by the payment of his legacy in money or in some other property. The act which is to transform such a contingent and destructible interest into a specific, enduring, and positive ownership, cannot be less important as an evidence of title than the will itself. By every rule of propriety and good sense, it should equally conform to the established standards of permanency and authenticity.

It is sometimes said that a trust need not be created by a writing. *Lane* v. *Ewing*, 31 Mo. 86. But to this saying is always added the qualification that a trust relating to real estate must, nevertheless, be proved by a writing. *Steere* v. *Steere*, 5 Johns. Ch. 1. Whether the duty to be performed in this instance be considered as an appointment or

a partition, to be made by the trustees, under a power conferred by the will, is wholly immaterial. In either case the trustees are to create a special trust in themselves in favor of Henry Ames, Jr., of such lands as they elect to assign to him in payment of his legacy ; which trust is to continue during his minority, and is to be exclusive of, and adverse to, the general trust held by them for the benefit of other legatees. When a court of equity is asked to sustain such a trust against the interests and claims of third parties, the trust must be duly proved. Upon this point of our inquiry the statute of frauds leaves nothing more to be said : "All declarations or creations of trust or confidence, of any lands, tenements, or hereditaments, shall be manifested and proved by some writing, signed by the party who is, or shall be, by law enabled to declare such trusts, or by his last will in writing, or else they shall be void." Rev. Stats., sect. 2511.

We are therefore of opinion that the so-called setting apart of lands by the trustees to Henry Ames, Jr., by way of a payment *pro tanto*, upon the bequest in his favor, was, for want of a proper appointment or declaration of trust, in writing, a nullity. The circuit court erred in treating such lands otherwise than as so much of the estate remaining undistributed. Their *status* at the commencement of the suit was essentially different from that of the stocks which, as will hereafter be seen, were effectually transferred to, and vested in, the beneficiary or his trustees.

It may be objected here that the conclusion thus reached goes beyond the record ; that the petition virtually admits the validity of the land allotment, as made, and complains only of unfairness in the valuation. But the words *set apart* as used in the petition do not necessarily imply a valid conveyance, or, indeed, any conveyance at all. Our conclusion does not deny the alleged setting apart ; it only finds that the act so described was a mere volition of the trustees, and not effectual to separate the lands from the

general fund. A court of equity in adjusting property rights must treat the titles as it finds them to be, whether properly set forth in the pleadings or not.

The plaintiff complains of general and gross mismanagement of the trust, and insists, not only that the trustees should be held accountable for compounded interest on cash funds at a high rate, but that they should also be denied any compensation for their services. In considering such demands upon the judicial authority, we must carefully discriminate between an infliction of punishment for dereliction, and a restoration of impaired or wasted assets. Courts of equity are not criminal tribunals; nor are they courts of ecclesiastical censure.

When a partner is found to have been privately speculating with the funds of his firm, he will be held to a division of the profits, not by way of punishing him for the violation of either moral or legal duty, but for the object of securing to the common interest its unquestionable rights in all the increase or proceeds of the common fund. For the same reason, if the profits cannot be ascertained, or if there were none, the speculating partner will be required to pay interest — often at the highest rate, compounded — for the funds employed by him. Money is always worth the legal rate of interest, and there is a strong presumption that it is worth more when devoted to trade or speculation. It follows that the partnership concern is entitled to compensation for the use of its moneys while withdrawn from their legitimate field of profitable employment, whether the speculating partner has been a loser or not. Even in its jurisdiction over fraud, the chancery tribunal does not impose a penalty — *qua* penalty — upon the wrong-doer. Strong presumptions of fact will sometimes arise from manifest wrong-doing, and the consequent judgment may, from its associations, appear to be punitory. But such is not the equitable intent. The true office of the decree is to place the parties and their rights, as nearly as possible, in

the same position which they would have occupied if no fraud had intervened. It may be that the guilty perpetrator will escape even the shadow of retributive justice. But that must, nevertheless, be left to the arm of criminal authority, or to such ecclesiastical tribunals, if any, as may have jurisdiction over the offender. The judicial opinions cited, in which language is used that seems to imply the imposition of equitable penalties, will, when fairly analyzed with the precedents on which they rest, be found to contain nothing in conflict with the principles here assumed. It will be observed, however, that there is a marked difference between the guarded terms usually employed by the English authorities in this connection, and the looser expressions found in some recent American decisions.

Keeping these distinctions in view, we look into the present record to find upon what grounds the charges for interest should be increased against the trustees. We do not discover such grounds in the failure of the trustees to devote their combined energies and discretion to the administration of the trust; in their partiality and preference given to one legatee, over all the others; in their failing to render proper accounts, as directed by the court; in their persistent litigation against rights which they knew to be unquestionable, or in their unfair valuations of property,— even if all the charges made in these relations be considered as sustained. The facts assumed do not indicate any realization of profits on the assets, or any withdrawal of funds from their legitimate channels of accumulation; nor do they raise any presumption that the assets would have been increased in any way if the line of duty had been more strictly followed.

There was a second reference in which the referee reported his views of the trustees' liability for interest. His conclusions were adopted by the court. He found that the trustees had charged against themselves all the interest for which they ought to be held. The account commences in

July, 1872, when the trust-moneys were deposited with
Henry Ames & Co. (of which firm one of the trustees was
a member), and there remained until June 2, 1874. The
firm used the funds in their business, paying interest there-
for at six per cent. From June 2, 1874, until November 8,
1877, the moneys were kept on deposit in bank, and were
loaned from time to time to various parties on call at six
per cent, except in one instance, where the loan was at four
per cent, and was secured by United States bonds bearing
the same rate of interest. After November 8, 1877, the
funds were kept with Henry Ames & Co., who again paid
interest at six per cent. All these several interest pay-
ments were charged by the trustees against themselves.
The testimony tended to show that Henry Ames & Co.
were at the same time borrowing money from other persons
at six per cent, and that that was a good rate for call loans.

We see nothing unreasonable in this disposition of the
interest question. The funds were turned over by the exec-
utors to themselves, as trustees, on July 9, 1872, and in
the September next following the present suit was com-
menced. This event suspended the power of the trustees
to distribute the fund — a circumstance which raises an im-
portant distinction between this case and that of Davis (62
Mo. 450), relied on for the plaintiff. In that case the
executor had on hand a large surplus, which he kept for
three years after all the debts of the estate were paid, and
when there was no reason why he should not obtain an
order of distribution and pay the money to the distributees.
Instead of doing this, he mingled the money with his
own, and used it for his own purposes. In the case before
us the trustees had no such option, after the whole fund
was placed under the control of the court. They could but
keep the money until the court should order otherwise.
They did not neglect to make it productive. On account
of the pendency of the suit they could make no permanent
loans at an advanced rate of interest, but they did what

seems to have been the best that was practicable for the interest of the estate, in making call loans at the current rate for such transactions. We cannot appreciate the argument which seems to imply that, while the trustees might have been blameless in thus loaning the money to outside parties, yet, because it was so loaned to a firm of which one of the trustees was a member, they must be held to a higher accountability, as having improperly used the trust-moneys for their own advantage. Such is not the spirit or the application of the distinction as it appears in the cases cited for the plaintiff. Had the trustees violated a statutory duty in failing to report proceeds realized, when they should have done so, as was done in *Williams* v. *Petticrew* (62 Mo. 472), and in the Camp case (6 Mo. App. 563); had they failed, when duty required, to apply to the proper source for instructions directing how the money should be disbursed, as in *Dunscomb* v. *Dunscomb* (1 Johns. Ch. 508); or had they in any manner covered up the fund, or withheld it from an application clearly required by law, in order to enjoy the use of the money for their own purposes, there might be some ground for the plaintiff's claim in this regard. But we find nothing of the sort in this record. The plaintiff, it is true, insists that during all this time it was the duty of the trustees to pay off the legacies. But that is a matter which the plaintiff herself, in instituting this suit, committed to the exclusive control of the court, depriving the trustees for the time being of all choice in the premises. As to the interval between June and September, 1872, there could hardly be such flagrancy in a delay of that duration as might demand a charge of special rates or compounded interest. If it be complained that the executors were tardy in realizing, or in turning over to the trustees, or in paying legacies, all this belongs to a different field of inquiry, and has nothing to do with the subject of interest upon moneys after they came to the hands of the trustees, in June, 1872.

Up to that time, the probate court had been adjusting all such matters in the settlements of the executors. It is not proposed, in this proceeding, to review the action of that tribunal.

This cause must be remanded to the circuit court for a new ascertainment of assets remaining in the hands of the trustees, and for computations of debits and credits, in accordance with the principles herein affirmed. We do not, therefore, go into details of the account, or scrutinize the result in figures, as stated and reached on an erroneous basis in the court below. It is intimated that there was a large loan made by the trustees for two or three years, on which no interest has ever been realized to the estate. This may be a proper subject for further examination by the circuit court.

We are not of opinion that the pendency of this litigation wholly excused the trustees from any effort to make the fund productive. If they doubted their right to loan, they should have applied to the court for instructions. If they did loan in fact more than is reported, they should have made the loan advantageous to the estate. The provision in the will which permitted them to delay distribution for five years after the death of the testator, in order "that sufficient time may be given to make the assets most productive," clearly shows the testator's intention that the trustees should be, not merely collectors and distributors, but also promoters of at least ordinary and reasonable accumulations.

The second referee — and the court also, in approval of his report — allowed the trustees commissions on their cash disbursements which had been duly approved, and on which they had not previously been allowed commissions, as executors. We think this was a proper basis of compensation, under all the circumstances. Among the many charges of mismanagement which, it is insisted, should deprive the trustees of compensation for their services, the most con-

spicuous is that of unreasonable and vexatious delay and refusal of payment upon the legacy to the plaintiff's intestate. This complaint, whether true or false, bears but a remote relation to those classes of trustee derelictions which usually forfeit the right of compensation. It involves no loss to the fund ; nothing which supposes that the services of the trustees have been injurious, rather than beneficial to the estate. But the precise facts of the case deserve some attention. Until August, 1871, — however, we may question the soundness of the defendants' judgment, — there was no delay by either executors or trustees, to which judicial exception could be taken, since the testator had expressly authorized it. During the ensuing thirteen months, the duty rested upon the trustees to apportion the estate according to the terms of the will. They began the work and virtually discharged the claim of the preferred legatee, by methods which had at least a color of authority. At the end of the same period, any further apportionment was stopped by the institution of the present suit. The trustees could then do nothing but await the result, exercising, at the same time, the common privilege of all citizens, to defend to the utmost what they understood and claimed to be their rights in the controversy. This they were fully at liberty to do, without amenability to any imputation of persistent and vexatious litigation. They are not here to be held responsible for the delays incident to a course of judicial procedure. We cannot find in the failure to pay legacies during that free interval of thirteen months, any sufficient reason for depriving the trustees of compensation for services and responsibilities extending over a period of eight or nine years. As to other causes of complaint, it may be conceded that the trustees' discriminations in favor of one of the legatees somewhat exceeded the boundaries set by the testator himself ; and that, in sundry particulars, the trustees might properly have shown a higher appreciation of the claims of other beneficiaries under the will. Yet

we are not thereby impressed with any such deliberate breach of trust, or vexatious or improper conduct, as would merit the judgment demanded by the plaintiff. . Upon similar considerations, we approve the allowances made below to the trustees, for costs and expenses.

The trustee defendants and Henry Ames, Jr., also appeal from the judgment of the circuit court, alleging that there was error in the setting aside of the allotment of stocks to Henry Ames, Jr. After this action of the court, one thousand one hundred and eight shares, which the trustees had estimated to the legatee at $44,320, were sold under the court's order, for $84,273.25. This does not include one hundred and forty-five shares· which the trustees had formerly sold to outside persons, and whose proceeds they had allotted to the same beneficiary. Nor does it include seventy-five shares similarly allotted, which the trustees failed to sell, as ordered. The court confirmed the sales so made.

It will not be disputed that the beneficial interests of the several legatees are vested in them by the will. The agency of the trustees is nothing more, in effect, than a power to designate and set apart to each beneficiary the specific money or property which he is to enjoy. *Collier's Will*, 40 Mo. 287. The bequest first reaches the trustees, as general intermediaries; so that, as already maintained, in the partition or setting apart of a portion from the whole, for the exclusive enjoyment of a single beneficiary, there must be some act done which will be effectual, both to divest the trustees of their dominion over this portion for the common purposes of the trust, and also to divest the other beneficiaries of their possible contingent and undivided interests in the same. But when such act is done, the purpose of the will is achieved — the transfer is final. A complete ownership becomes vested in the beneficiary, not from the trustees, as his grantors, but from the will itself, which has made them conduits for the transmission of its

bounty. To the extent of this transaction, then, the will is perfectly executed, according to the direction of the testator. Exclusive ownership in the beneficiary is now as unassailable as if the bequest had been directly to him, and the property duly delivered accordingly. All this being done while no suit is pending, under what claim of authority can a court of equity afterwards deprive him of his right? To say that this may be done upon a clear showing that the trustees have usurped an authority not given by the will, or that they have failed in some condition annexed to the power, or that, by reason of some omission, the act was not performed in the manner required by law, is merely to negative the terms of our leading proposition, which imply a formal and complete exercise of the power confided to the trustees. In the present instance, we cannot discover wherein the act of transfer, pure and simple, considered in itself alone, failed in a single essential of formality and completeness under the provisions of the will and the law of the land. The stocks, at any possible valuation, were within the amount of the $200,000 legacy. The act of transfer was jointly performed by the two trustees, and was duly consummated on the transfer-books of the several corporations. Nothing could be added to this investiture of title in the stocks, if the testator had capacity to bestow them upon his son by last will and testament. The son insists upon his right to hold them, and we perceive nothing upon which a court of equity may found a denial of his claim. It is worth while to consider that the testator may have desired to secure to his legatee the benefit of the trustees' discretion, in transferring to him, preferably to money, property which would be likely to increase in value. When such a discretion has been deliberately exercised and its purpose consummated, it cannot be right to set it aside and substitute the discretion of the court for that of the repositories chosen by the testator.

But does the transaction involve an injustice to other

legatees and a detriment to the trust, in an improper valuation of the property? This is another question, distinct in its solution and consequences from that of the validity of the transfer. If the valuation was wrong, and there is a jurisdiction to correct it, the remedy lies in such a correction, and not in an annulling of the entire transaction. So much as is valid should remain undisturbed. The stocks were to be allotted at a valuation, to be reached in a certain way. If the valuation has been fixed in a different way, — not according to the direction of the testator, — and so as to withdraw from the fund a larger portion than would otherwise be necessary to make up the residue of the legacy, then this is so much in excess of, or — which is the same thing — in departure from, a rightful execution of the power. The trustees, for instance, in paying the whole legacy of $200,-000, must consume more of the trust property than the will intends shall be so used. If the excess or departure be separable, it is the duty of the court to let the execution stand, so far as it is consistent with the limitations of the power, and to reform only that which transcends them. *Palmer* v. *Wheeler*, 2 Ball & B. 28; *Hervey* v. *Hervey*, 1 Atk. 568; *Warren* v. *Howell*, 3 Wash. C. Ct. 12; *Smith* v. *Camelford*, 2 Ves. Jr. 71; 2 Sugden on Pow. 75, 78. Henry Ames, Jr., is entitled to hold the stocks allotted to him. But it is not reasonable that his co-legatees should pay for them by a diminution of their respective shares in the trust estate.

In the application of these principles it is, first of all, necessary to inquire whether the discretion vested in the trustees to put a valuation upon the property allotted, is one which can be reviewed or controlled under any circumstances, and whether it has in fact been exercised within the limitations imposed upon it by the terms of the will.

If an absolutely unlimited discretion be confided to a trustee, no court can sit in judgment upon the wisdom of its exercise, nor can any undertake to control or modify its

conclusions. If boundaries be defined or methods prescribed, for the exercise of the discretion, the trustee will
still be untrammelled within such boundaries or methods,
but it will be the duty of a court of equity to prevent his
transcending the one, or discarding the other. Thus, in
*Haydel* v. *Hurck* (5 Mo. App. 267), this court construed
the will as limiting the trustee, in his expenditures for the
support of the testatrix's brother, to the income of the estate, and thereupon denied him any right so to exercise his
discretion as to intrench upon the capital fund. The supreme court (72 Mo. 253), in reversing the judgment, did
not question the propriety of our ruling, under such an interpretation of the power. But it construed the will as
giving the trustee unlimited control, for the purpose indicated, over capital stock as well as income, and hence held
that, however extravagant were his allowances to the brother,
and however destructive of the estate, there could be no
review of his discretion in making them. There was no
need of that decision to fix this result upon such an understanding of the meaning of the will. The law is well settled,
and the vital inquiry in all such cases is: What are the extent and limits of the discretion conferred by the creator of
the trust? and have they been exceeded or not by the
trustee?

The discretion vested in the present trustees by the will
of Henry Ames, to determine the value of the property allotted by them, instead of money, to the legatees, is not unlimited. 1. It must be exercised by both the trustees; not
by one alone. The testimony tends to show that, while the
formal act of transfer of the stocks was done, as a matter of
necessity, under the hands of the two trustees, yet, in everything else connected with the transaction, one of them
thought and acted alone. This trustee had the "general
control" of matters connected with the trust, and the other
"had nothing to do with it at all." This other "knew
nothing about the estate." He "did not know any

more about the trusteeship than a man who never saw it."
As he expressed it, he acted "only figuratively. * * *
I never had a transaction with the Ames estate of any sort,
shape, or description. I never interfered about it, except
that my brother might ask me about some stocks." He
left the management entirely to his brother; "as much
so," he adds, "as if I had never seen it." It may be con-
ceded that this testimony does not conclusively establish the
fact that one of the trustees took no part in the valuation
of the stocks; yet it very strongly preponderates in that
direction. The language of Chancellor Kent in *Berger* v.
*Duff* (4 Johns. Ch. 369), seems quite appropriate here:
"One executor in this case cannot commit his judgment
and discretion to the other, any more than to a stranger, for
*delegatus non potest delegare*. The testator intends that his
representatives should have the benefit of the judgment of
each of the executors applied to the given case, so long as
both of them were alive." 2. The valuation is required
to be such as shall appear to the trustees — both of them —
"fair and just." The evidence is, that the active trustee
caused the stocks to be offered for sale to the highest bid-
der, at the Merchants' Exchange, upon no other notice than
the issuing of some circulars within the building on the
same day. The highest bids were those of the trustee him-
self. The amounts of those bids were thereupon adopted
as the values of the stocks, for the purpose of turning them
over to the legatee. In such a proceeding we see nothing
like an exercise of the discretion intended by the terms
of the will. It is asserted that this was a method fairly
adopted for the purpose of ascertaining the values of the
stocks. But, considering the short and imperfect notice
given, it imparted nothing more than the prices, if so much,
which the persons who happened to be present were willing
to give. The stocks were put up in large and compara-
tively unsalable blocks. The persons present had assem-
bled there for other purposes and may have been unprepared

for large cash investments, or may have not wanted the stocks at all. That the bids made by other persons were not accepted by the trustee as indicating the "fair and just" values, is shown by his refusal to let the stocks go at such figures. But the same fact is more conclusively proved by the testimony of the trustee himself. Being questioned about the State Savings Bank stock, he testified: "I believe it ought to have brought sixty, instead of forty. *Q.* As to any other of the stock? *A.* Belcher's ought to have brought sixty-five. *Q.* Instead of what? *A.* Forty. I was the only bidder on them. * * * As I said before, I thought it [State Savings] was worth sixty, although I have seen it sold in the last three months at sixty, although it was worth more. I consider it worth eighty now, and it has sold at public auction for sixty in two months, I think, by Mr. McCluney. *Q.* In the case of the sale you have just stated, that illustrates that what that stock would bring at auction is not necessarily its real, reasonable, market value? *A.* Yes, sir, decidedly so." Here are direct admissions by the trustee that the valuations at which the stocks were allotted to the legatee were *not* such as appeared to him "fair and just." He knew that the prices thus indicated were much below the "real, reasonable, market values;" and he might, with scarcely less propriety, have taken them from successive throws of the dice, instead of consulting his own "fair and just" judgment, as directed by the testator. Surely there could not be a more convincing demonstration that the trustee — even in his single person — did not at all exercise that discretion which the testator had invoked and depended upon, for a fair and judicious distribution of his bounty, according to the carefully devised plan contained in his last will and testament.

The final decree in the circuit court, after adjusting the accounts of the trustees upon the several bases of allowance and disallowance previously declared, together with a large number of debits and credits for receipts and disbursements

not specially considered in this opinion, finds that the balance in the hands of the trustees will satisfy what remains unpaid on the preferred legacy to Henry Ames, Jr., and a *pro rata* of ninety-seven per cent on the deferred legacies, and it is decreed accordingly. For the purpose of reaching a result from the basis sustained in this opinion it will be necessary to modify some of the items in the account. 1. Henry Ames, Jr., will be treated as owner of the stocks which were allotted to him, from the date of the allotment until their sale by order of the court. To that end, he will be charged with the fair value of the stocks when allotted, as reported by the first referees, and will be credited with all dividends realized up to the sale, and with the proceeds of the sale, less the amount of his own purchases. He will thus realize the benefits of increased values and of profits with like effect as if he had at first acquired the stock at a proper valuation, and had continued to hold them until sold. Upon a sale made in a proceeding to which he was a party, the rights of third persons attached, as purchasers for value. The legatee was himself a purchaser at the same sale. These considerations, together with the fact that any supposed proprietary advantages which might have accrued afterwards must be purely speculative, render it improper, as well as impracticable, to attempt any further provision for the rights of ownership. 2. As to the lands said to have been allotted to Henry Ames, Jr., and which have not been otherwise disposed of, they should be treated as undistributed assets remaining in the hands of the trustees. If any conveyances have been made, whereby third parties have become interested; or if, for any reason, it shall be found inequitable for the trustees to reassume control for purposes of sale or distribution, then, as to the lands so implicated, the legatee should be charged with the amount of their value when set apart to him, as reported by the first referees.

Whatever disposition may be thus made of these lands,

the matter of rents and profits received since the setting apart demands serious consideration. It may be suggested that, inasmuch as it was the honest and fair intention of the trustees to allot the lands finally to the legatee, equity would be satisfied by a decree vesting the title in him, as of the date of the supposed allotment, with a substitution of the value reported by the referees for that charged against the legatee by the trustees. But there appears an incongruity in the recognition of the alleged allotment, for any purpose whatever. The entries on the mercantile books did not even rise to the dignity of memoranda in writing within the statute of frauds. They simply credited the legatee with a sum in cash, equal to the assumed value of the lands. There was not even a defective execution of a power which equity might aid. There was nothing more, in effect, than an effort of the mind, and probably not even that, as to one of the trustees.

It must be borne in mind that, in the settlement of the trust estate, the first and most imperative demand upon all concerned is, that the " end designed " by the testator shall be accomplished, if possible, in literal fulness. This means not merely a caring for the interests of a preferred legatee, but a payment in full of all the testator's bequests, if the estate be sufficient. The trustees had no right, and the courts have no authority, to subordinate the payment of the deferred legacies to any consideration, beyond the precedent payment of $200,000, *and no more*, to Henry Ames, Jr. To this " end designed," in its most comprehensive capacity, all the resources of the estate must be devoted, with prudence, impartiality, and judicious care. Strictly, the preferred legatee should be charged with all the rents and profits received by him from the lands in question up to the date of the decree. He may complain that this will be, in effect, subjecting him to a long wait for the enjoyment of property, with its emoluments, which it was intended he should have had in hand many years ago.

But, aside from a mere precedence in the order of payments, relatively to each other, his legacy may just as properly be withheld for a series of years, as those of the other legatees. Parental affection and' preference are not to be carried beyond the limits which the testator himself has assigned to them. Nothing in the will insinuates that the son may hold and enjoy the profits of his share in the estate for an indefinite period, while the deferred legatees may touch neither property nor profits, and while there lies in the hands of the trustees a large fund which ought to be distributed. Least of all is such partiality to be tolerated, when its direct tendency, by diverting accumulations, is to thwart the '' end designed,'' in the full discharge of all bequests. The preferred legatee would unquestionably have been entitled to the income if the lands had been effectually assigned to him. But as this was never done, there can be no hardship in placing him upon a like footing with other legatees who have received nothing. It now seems fair to presume, however, that a readjustment of accounts, as herein found necessary, will provide for full payment of the deferred legacies without any assistance from the rents and profits under consideration. In that event these rents and profits will constitute, or enlarge, a surplus to be returned to Henry Ames, Jr., as residuary legatee. It is assumed that he has now reached his majority. If the fact be so it should be made to appear upon the record, at or before the final decree.

As to the lands, which may again be treated as part of the trust-fund, the court may vest the titles in the preferred legatee, at the valuations reported by the referees, or may order a sale of them, as may be found the more consistent with equity, conducive to the benefit of the estate, and promotive of the general ends designed by the testator. As to the numerous items in the accounts which are not herein specially considered, we find no reason to question the propriety of the circuit court's action there-

upon. They will, however, be considered open to any corrections, additions, or modifications which may be found legal or proper in the future progress of the cause.

The judgment is reversed, and the cause remanded for further proceedings in accordance with this opinion. The other judges concur.